IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| JUSTIN E. FAIRFAX                    )<br>8106 Guinevere Drive          )<br>Annandale, Virginia 22003,    )<br>                             )<br>     *Plaintiff*,            )<br>                             )<br>       v.                  )<br>                             )<br>NEW YORK PUBLIC RADIO   )<br>160 Varick Street             )<br>New York, New York 10013,   )<br>                             )<br>WNYC                          )<br>160 Varick Street              )<br>New York, New York 10013,   )<br>                             )<br>    *Defendants*.        )| Civil Action No. **1:22-cv-00895** |

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiff Justin E. Fairfax ("Justin Fairfax" or "Fairfax") files this Complaint against

Defendants New York Public Radio and WNYC (together "NYPR"), and states as follows:

**NATURE OF THE ACTION**

1.       This defamation suit arises primarily from intentionally fabricated, false, and

politically-motivated express and implied defamatory *per se* and *per quod* statements made with

"actual malice" by both Meredith Watson ("Watson") and Vanessa Tyson ("Tyson") alleging

fictitious and intentionally fabricated sexual assaults by Justin Fairfax against them in 2000 and

2004, respectively. Those statements were published, republished, repeated, endorsed and

presented as fact – both expressly and in context – with "actual malice" by NYPR and Melissa

Harris-Perry ("Perry") on or about August 6, 2021, during a broadcast of NYPR's and WNYC's

news program "The Takeaway" titled "Politics, Power, and Abuse" ("The Broadcast" or "The

Interview").1  In The Broadcast, Perry, as Interim Host of the show,2  conducted and published

an interview with Tyson – her former student, academic colleague and longtime close friend3  –

and also republished (on-air and online) defamatory *per se* and *per quod* audio statements

_____

1  Under Virginia law, a party who has been defamed <u>*must*</u> file a lawsuit within 1-year of the slander or libel at issue in order to maintain a legal claim for the damages caused by the offending parties' defamatory statements. Because the defamatory statements were published by NYPR and WNYC on or about August 6, 2021, Plaintiff must bring this action now in order to preserve and vindicate his rights under Virginia law.

See, Va. Code Ann. § 8.01-247.1. ("Limitation on action for defamation, etc. Every action for injury resulting from libel, slander, insulting words, or defamation shall be brought within one year after the cause of action accrues.")

2  Upon information and belief, at all relevant times as host of The Takeaway, Perry was acting as an employee of NYPR acting within the scope of her employment and/or as an authorized independent agent of NYPR. As they related to The Broadcast, the actions and statements of Perry and/or the editorial and production staff, teams and agents of The Takeaway news program were directed, authorized and/or endorsed by NYPR and WNYC.

3  Perry introduced Tyson on-air as follows at the outset of the August 6, 2021, NYPR Broadcast of "Politics, Power, and Abuse:"

**Melissa Harris-Perry: "**Vanessa Tyson is a professor of political science at Scripps College in Southern California. I first met Vanessa more than 20 years ago. Having graduated from Princeton University with an award-winning senior thesis, she came to the University of Chicago to earn a PhD. in political science. I just began working as an assistant professor in the department at UChicago.

Vanessa's keen intellect, generosity of spirit, and deep commitment to racial and gender justice were readily apparent. This week, she sat down with me here on *The Takeaway* to discuss the news about Governor Andrew Cuomo, and to reflect of her own very public journey over the past several years. I asked how she felt when she first learned about the New York Attorney General's report detailing Governor Cuomo's pattern of sexually harassing women with whom he worked."

originally made by Watson during her April 2, 2019 national television interview with Gayle King on CBS This Morning.4

2.     NYPR and Perry did not interview Watson on the Broadcast and, upon information and belief, they did not contact Watson or her attorney Nancy Erika Smith to ask Watson any questions about her statements that NYPR planned to (and ultimately did) air during The Interview or about her accusations against Fairfax in general. If NYPR or Perry did ask such questions, they conspicuously failed to report that information to the audience during or after The Broadcast.

3.     This failure to interview – or even seek to contact – Watson or her representatives prior to airing her salacious claims on The Broadcast is particularly reckless given that Watson herself **had not made any public statement or answered any questions** about her accusations – including serious inconsistencies that directly called into question the truth of her claims – since her April 2, 2019, interview with Gayle King on CBS This Morning.

4.     Astonishingly, at the time of NYPR's Broadcast, 2 years, 4 months, and 4 days (or 857 consecutive days) had passed since Watson had last been publicly seen or heard from, or since she personally had answered even a single investigative question about her false accusation against Fairfax. And yet, NYPR and Perry saw no need – and apparently took no journalistic steps – to ask any questions about Watson's claims or credibility before republishing portions of her damaging fabricated statements about Fairfax from Watson's April 2, 2019, CBS This

---

4 Perry subsequently re-published The Broadcast on her twitter account (@MHarrisPerry) on or about August 10, 2021. Tyson re-published The Broadcast on her twitter account (@VanessaCTyson) on or about February 21, 2022.

Morning interview. In over 2 years, Watson had not even answered the most basic questions about her accusations from alleged events of 20 years ago, including in whose dorm room at Duke University did this supposed assault take place (the simple answer is, Dhamian Blue's room) and whether a third-party exonerating eyewitness, Dhamian Blue, was present in his dorm room during the encounter (the simple answer is, Yes.). NYPR and Perry did not ask these questions of Watson or Smith (or, if they did, did not report their answers or non-answers to the listening audience) even though there was tremendous reason to doubt Watson's credibility or the truth of her allegations.

5. NYPR and Perry purposefully avoided the truth and published and republished Watson's more than 2-year-old statements with a high degree of awareness of probably falsity and with knowledge of falsity and/or a reckless disregard for the truth. NYPR and Perry were not interested in the truth. Instead, they sought to (and did) provide Tyson – a close and longtime friend of Perry – and others with yet another new platform to continue and broaden the smear campaign against Fairfax in an obvious effort to further defame and harm Fairfax without consequence.5

6. NYPR and Perry also did not ask **_any_** investigative questions of either Watson or Tyson on The Broadcast to probe the truth of their statements and accusations against Fairfax or to test their credibility.

---

5 Although the purported prompt for, and main subject of, The Interview was New York Governor Andrew Cuomo and accusations of sexual harassment and assault then leveled against him, the overwhelming majority of the dialogue between Perry and Tyson during the "Politics, Power, and Abuse" program focuses on Tyson's unrelated and uncorroborated 2019 allegations against Fairfax.

7.     These fabricated, uncorroborated, completely uninvestigated and suspiciously-timed claims by Watson and Tyson have been weaponized against Fairfax, the former Lieutenant Governor of Virginia, for over three and a half years – during which time Watson, Tyson and their attorneys, Nancy Erika Smith (Smith Mullin, P.C.), Debra Katz and Lisa Banks (Katz, Marshall and Banks – now Katz, Banks Kumin LLP), and public relations representatives – SKDK, Karen Kessler and Warren Cooper of Evergreen Partners (now KesslerPR Group) and Karen Finney – have avoided any law enforcement or other investigations into their allegations – in one of the most vicious, orchestrated and consequential political smear campaigns in Virginia and American history.6

8.     No person – let alone a longtime public servant elected by a record 1.36 million Virginians to serve all the people of the Commonwealth – should have their rights, reputation, career, livelihood and peace of mind trampled so wantonly and recklessly for so long with no

---

6 It is notable that Tyson and her attorneys Debra Katz and Lisa Banks made public statements to the press in February 2019 confirming that Tyson would meet with prosecutors in the Boston/Suffolk County District Attorney's Office to "detail her allegations" against Fairfax. The media immediately reported those assertions in what clearly appears to have been a PR stunt. More than three and half years later, there is no indication that Tyson ever met with the District Attorney's Office or filed a criminal complaint (as Fairfax has urged since Day One to be able to clear his name). Prosecutors should not be invoked for PR purposes to further defame and damage an innocent person's reputation, and false accusations should not be allowed to hang indefinitely over the head of anyone in this country, which cherishes and upholds the rule of law.

See, e.g., "Fairfax Accuser To Detail Allegations To Boston Prosecutors," *CBS Boston* (February 13, 2019), https://www.cbsnews.com/boston/news/justin-fairfax-virginia-lt-governor-sex-assault-accusation-boston-2004-suffolk-county-district-attorney-vanessa-tyson/

"Fairfax accuser to detail allegations to Boston prosecutors," *Associated Press* (February 13, 2019), https://apnews.com/article/e71d97229d0d4116a6846cc28f8e5835

accountability, no remedy and no end in sight. After three and a half years, it is well-past time for this unprecedented and media-enabled smear campaign to be brought to the light of truth and, at long last, to an end.

9.      Fairfax brings this action to restore his reputation and clear his name, ensure the truth prevails, stop the weaponization of false allegations of sexual assault against him and finally vindicate his rights under civil law.

10.     As a Virginia former federal prosecutor, federal law clerk, civil and criminal defense attorney, member in good standing of the Virginia and District of Columbia Bar Associations and an officer of the court, Fairfax also seeks to finally stop the unethical and extraordinarily destructive practice of allowing private attorneys and public relations firms and professionals to assume the unchecked role of "private prosecutors" who seek to exercise all of the consequential power of actual prosecutors and none of the ethical, duty-bound responsibilities to seek justice, fairness, transparency and truth – even, and perhaps especially, when it comes to exonerating someone from serious false and fabricated allegations. These "private prosecutors":

> a.   routinely "indict" innocent people simply with the stroke of an unvetted press release, email and/or social media post – rather than through what they perceive as the inconvenience of our nation's constitutionally-guaranteed system of due process involving a grand jury, judge and individual rights;

b.  *immediately* convict innocent people in the media and the court of public opinion

with no vetted evidence, investigative process, trial, opportunity to respond or be

heard and no due process;7

---

7 See, e.g., "I Was Wrong About Al Franken," **Michelle Goldberg,** *New York Times*, Opinion (July 21, 2022):

"**Nevertheless, I regret calling for Franken to resign without a Senate investigation.** (I later wrote a piece about my ambivalence over Franken, but never took back the call for him to quit.)

**Due process is important whether or not a person did what he or she is accused of, and the absence of it in this case has left lasting wounds**. Carried away by the furious momentum of #MeToo, **I let myself forget that transparent, dispassionate systems for hearing conflicting claims are not an impediment to justice but a prerequisite for it.**
This is not, of course, unique to the Franken affair. During #MeToo, many feminists tried to find a way to move beyond the reflexive doubt that too often greets people who speak out about sexual misbehavior. **But a reflexive assumption of guilt is not a decent substitute.** Privately, we are free to come to our own conclusions. In public life, however, we should aim to hold several, sometimes contradictory ideas in our heads at once — that accusers have little incentive to lie and deserve a presumption of good faith**, that to be subject to a false accusation can be shattering,** and that in some cases, both parties think they're telling the truth.

Some feminists argue that the concept of "due process" doesn't really apply outside the legal system; it's possible that I've said something similar myself. "Losing Your Job for Sexual Harassment Is Not a Violation of Due Process," said a 2018 headline from Rewire News Group. Due process, wrote Caroline Reilly, "is violated when the government takes away a right."

Technically, this is true, but colloquially, **due process usually means hearing people out and treating them according to clear and neutral rules.** In the Franken case in particular, **I was wrong in thinking it was possible to separate what was fair to him and what was fair to everyone else….**

If there had been a Senate investigation into Franken's behavior, it probably would have been an ordeal for Democrats, and might have slowed the momentum of #MeToo. **But a more cautious, deliberate movement wouldn't have been such a bad thing.** In the end, Franken might have had to resign anyway, **but it wouldn't have seemed that he'd been railroaded**. **Due process may not be convenient, but there's no legitimate way around it."** (emphasis added)

c.  seek immediate and devastating personal, professional, political and economic

sanctions against people who are merely accused (and these "private

prosecutors" and their teams can accuse *literally anyone at any time for any*

*reason*)– with no suitable remedy for someone who is later found to have been

falsely accused and/or wrongfully convicted;8

---

8 See, e.g., "**Wrongful Convictions," Equal Justice Initiative, (last visited August 5, 2022),**
**https://eji.org/issues/wrongful-convictions/**

**"Thousands of people have been wrongly convicted across the country in a system defined**
**by official indifference to innocence and error.**

**There are more innocent people in our jails and prisons today than ever before. The rate of**
**exonerations continues to rise, revealing an unreliable system of criminal justice. A lack of**
**accountability for police and prosecutors, reliance on junk science and mistaken**
**eyewitnesses, and the indigent defense crisis are major contributors to wrongful convictions**
**that have undermined the credibility of our system and ruined the lives of innocent men**
**and women.**

**EJI challenges wrongful convictions and exposes the unjust incarceration of innocent**
**people that undermines the reliability of even the most serious cases.**

**Causes: Exonerations tell us a lot about what causes wrongful convictions.**

**More than half of wrongful convictions can be traced to witnesses who lied in court or**
**made false accusations. In 2018, a record number of exonerations involved misconduct by**
**government officials. Other leading causes of wrongful convictions include mistaken**
**eyewitness identifications, false or misleading forensic science, and jailhouse informants.**

Faulty forensics also lead to wrongful convictions. Many forensic techniques aren't scientifically
validated. These "junk science" techniques include:

Hair microscopy
Bite mark comparisons
Firearm tool mark analysis
Shoe print comparisons
Innocent people have been convicted because forensic lab workers made errors in testing,

_____

testified inaccurately about their results, or fabricated results. In 2015, EJI won the exoneration and release of Anthony Ray Hinton, who spent 30 years on Alabama's death row after being wrongfully convicted of capital murder based on a faulty bullet match, and Beniah Dandridge, who spent 20 years in prison after being wrongfully convicted based on an erroneous fingerprint match.

Inadequate lawyers can cause wrongful convictions, too. Overworked and underfunded defense lawyers lack the resources to vigorously test the prosecution's evidence at trial, and people who are wrongly convicted and imprisoned have no right to counsel after their cases are affirmed on direct appeal.

**African Americans are burdened by a presumption of guilt that most defense lawyers are not prepared to overcome. As a result, African Americans make up 47% of exonerations even though they are only 13% of the population. Innocent Black people are about seven times more likely to be convicted of murder than innocent white people, and Black people who are convicted of murder are about 50% more likely to be innocent than non-Black people convicted of murder.**

Children and people with mental disabilities are especially vulnerable to being wrongly convicted. EJI won the release of Diane Tucker, a woman with intellectual disability who was wrongfully convicted of murdering an infant, by obtaining medical evidence that proved the baby never existed.

**Official Indifference: A major factor in wrongful convictions is official indifference to innocence and error.**

Counties, states, and the federal government all have different rules and policies about preserving evidence and providing access to testing that could prove an incarcerated person's innocence. **Even when incarcerated people manage to get evidence that proves their innocence, police and prosecutors often refuse to re-examine the evidence or re-open the case.**

**Police, prosecutors, and judges are not held accountable for misconduct that leads to wrongful convictions, such as fabricating evidence, presenting false testimony, or refusing to consider proof of innocence.** Immunity laws protect them from liability even in cases of gross misconduct. **Prosecutors can't be held liable for falsifying evidence, coercing witnesses, presenting false testimony, withholding evidence, or introducing illegally-seized evidence at trial.**

**Some prosecutors have set up Conviction Integrity Units, also known as Conviction Review Units—a section of the prosecutor's office that seeks to prevent, identify, and remedy false**

d.  hang false accusations over innocent people's heads for years on end –

destroying the constitutional guarantee and safeguard of a "speedy trial";

affording people whom they have selectively chosen to target9  no investigation

or formal independent investigative process or forum to finally establish the

falsity of the accusations against them or to clear their name;

---

convictions. **Unlike teams assigned to review individual cases or a series of questionable convictions, CIUs are designed to operate indefinitely and have a dedicated staff.**

Only 95 CIUs are operating at mid-year 2022 out of more than 2,300 prosecutor's offices nationwide. And while CIUs—alone or in cooperation with other groups—helped secure 60% of exonerations reported in 2021, their impact varies dramatically. Of currently operating CIUs, 53 have not produced a single recorded exoneration."

9  These "private prosecutors" – often acting for political reasons and in concert with political actors – do not treat all accused alike. Depending on who the accused person is and the aims and goals of the "private prosecution," some people who face the same allegations are not immediately assumed to be guilty, are not asked to immediately resign their offices, face impeachment or lose their jobs, are not repeatedly referred to in the media and social media by these private prosecutors and their press representatives as "rapists," "accused rapists," predators," or "abusers" (even where the accused adamantly maintain their innocence and have never been convicted of, or even charged with, any crime).

For *some* accused, the allegations are never mentioned or ***are quickly forgotten by the private prosecutors and the media***. For others, the allegations are immediately published (with no competent corroborating evidence or investigation by the media) and are forever attached to the name and legacy of the accused; even when those allegations later prove to be false. This is especially dangerous and unjust, particularly where we already have a criminal legal system where, all too often, innocent people are falsely accused and railroaded (often highlighted by the extraordinary work of organizations like The Innocence Project and the Duke University Wrongful Convictions Clinic); and the accused are treated very differently based on their race, socioeconomic class, community location and community history in our nation.

e.   use the media to continually punish innocent people who have merely (and

falsely) been accused by repeating baseless and defamatory accusations *ad*

*nauseum* far and wide in the media which gives them ready and extensive access

to broadcast whatever allegations they so choose;

f.   withhold and refuse to turn over or comment on exonerating, exculpatory

evidence that undermines and helps disprove accusations of wrongdoing – one of

the highest ethical duties enforced by the courts on actual prosecutors.10

---

10  See, e.g., "Rampant Prosecutorial Misconduct," *New York Times (Editorial Board)* (Jan. 4, 2014), https://www.nytimes.com/2014/01/05/opinion/sunday/rampant-prosecutorial-misconduct.html

"In the justice system, **prosecutors have the power to decide what criminal charges to bring, and since 97 percent of cases are resolved without a trial, those decisions are almost always the most important factor in the outcome. <u>That is why it is so important for prosecutors to play fair, not just to win. This obligation is embodied in the Supreme Court's 1963 holding in Brady v. Maryland, which required prosecutors to provide the defense with any exculpatory evidence that could materially affect a verdict or sentence.</u>**

Yet far too often, state and federal prosecutors fail to fulfill that constitutional duty, and far too rarely do courts hold them accountable. Last month, Alex Kozinski, the chief judge of the United States Court of Appeals for the Ninth Circuit, issued the most stinging indictment of this systemic failure in recent memory. **"There is an epidemic of Brady violations abroad in the land," Judge Kozinski wrote in dissent from a ruling against a man who argued that prosecutors had withheld crucial evidence in his case. "Only judges can put a stop to it."**

The defendant, Kenneth Olsen, was convicted of producing ricin, a toxic poison, for use as a weapon. Federal prosecutors knew — but did not tell his lawyers or the court — that an investigation of the government's forensic scientist, whose lab tests were critical to the case, had revealed multiple instances of sloppy work that had led to wrongful convictions in earlier cases. A state court found the scientist was "incompetent and committed gross misconduct."

Yet the majority of the federal appeals court panel ruled that the overall evidence of Mr. Olsen's guilt — including websites he visited and books he bought — was so overwhelming that the failure to disclose the scientist's firing would not have changed the outcome.

11.    Furthermore, not one of the individuals or entities who have initiated, pushed or

joined in on the "private prosecution" and media smearing of Fairfax – including the attorneys,

press representatives or political and media figures and actors – would tolerate in any way, shape

or form being treated in the exact same manner that they have treated Fairfax. Because it is plain

wrong, unjust and un-American. If, hypothetically, Nancy Erika Smith, Debra Katz, Lisa Banks,

---

This is the all-too-common response by courts confronted with Brady violations. Judge Kozinski was right to castigate the majority for letting the prosecution refuse to turn over evidence "so long as it's possible the defendant would've been convicted anyway," as the judge wrote. This creates a "serious moral hazard," he added, particularly since prosecutors are virtually never punished for misconduct. According to the Center for Prosecutor Integrity, multiple studies over the past 50 years show that courts punished prosecutorial misconduct in less than 2 percent of cases where it occurred. And that rarely amounted to more than a slap on the wrist, such as making the prosecutor pay for the cost of the disciplinary hearing.

Brady violations are, by their nature, hard to detect, but Judge Kozinski had no trouble coming up with more than two dozen examples from federal and state courts just in the last few years, and those are surely the tip of the iceberg. **According to the National Registry of Exonerations, 43 percent of wrongful convictions are the result of official misconduct.**

The Brady problem is in many ways structural. Prosecutors have the task of deciding when a piece of evidence would be helpful to the defense. But since it is their job to believe in the defendant's guilt, they have little incentive to turn over, say, a single piece of exculpatory evidence when they are sitting on what they see as a mountain of evidence proving guilt. **The lack of professional consequences for failing to disclose exculpatory evidence only makes the breach of duty more likely. As Judge Kozinski wrote, "Some prosecutors don't care about Brady because courts don't make them care."**

Courts should heed Judge Kozinski's call, but it will take more than judges to fix the problem. **Prosecutors' offices should adopt a standard "open file" policy, which would involve turning over all exculpatory evidence as a rule, thus reducing the potential for error.**

**Fighting prosecutorial misconduct is not only about protecting the innocent. It is, as Judge Kozinski wrote, about preserving "the public's trust in our justice system," and the foundation of the rule of law."**

Warren Cooper, Karen Kessler, Karen Finney, Kendra Barkoff Lamy, Melissa Harris-Perry,
Vanessa Tyson, Meredith Watson, any elected official who called for Fairfax's immediate
resignation or anyone who works at New York Public Radio or CBS were accused of misconduct
– especially if they knew they were innocent – would they happily accept:

    a.  Immediately – and without investigation – being placed on leave from their law firm partnerships or other places of employment?

    b.  Immediately – and without investigation – being removed from any University, civic or other Boards on which they sat?

    c.  Being called – with no competent evidence, investigation or due process – a "rapist," "accused rapist," "predator," or "abuser" in national and local newspaper, television and radio broadcasts and on social media?

    d.  Watching as lawyers, press representatives and firms, and false accusers promote and repeat vicious fabricated allegations against them on national, local and social media for *years* on end while avoiding any independent investigation to give them an opportunity to establish that the accusations are false or to clear their names?

    e.  Seeing all the hard work, sacrifices of generations of their families, and their efforts to overcome enormous odds to rise from underprivileged and tough environments to take on positions of responsibility and service immediately meant to be destroyed simply because a press release was issued?

12. Of course, the answer to each of these questions is No. They would not want to be treated in that horrific and unjust manner (And Fairfax would not wish that upon them or tolerate that for them, either). However, they have found it just fine to treat Fairfax in this manner for years on

13

end. The time to stop this smear campaign – which NYPR and Perry chose on August 6, 2021,

to continue and re-direct to a new and broader audience – is now.

13. At the time of the publication of The Broadcast, NYPR and Perry published, re-published,

endorsed and presented as fact the defamatory express and implied statements by Watson and

Tyson with knowledge that those statements were false and/or with a reckless disregard for

their truth. NYPR and Perry also published and re-published these statements with a high

degree of awareness of their probable falsity, and they engaged in a purposeful avoidance of

the truth concerning exculpatory information serving to establish Fairfax's innocence –

including the existence of an exonerating eyewitness – Dhamian Blue – involving the

fabricated allegation made by Watson, which had been widely-reported beginning on July 10,

2019 – more than two years before The Broadcast.11  Before, during and even after The

---

11 See., e.g., "Eyewitness can say Lt. Gov. Fairfax did not rape Duke classmate, lawyer says,"
***WTKR*** (July 10, 2019), https://www.wtkr.com/2019/07/10/eyewitness-can-say-lt-gov-fairfax-did-not-rape-duke-classmate-lawyer-says/;

"Virginia Lt. Gov. Fairfax says eyewitness backs up his story," ***Associated Press*** (July 10, 2019),
https://apnews.com/article/40942b841c814ee988f26a8ff3af77f6

"Lawyer for Virginia Lt. Gov. Fairfax says witness will corroborate that sexual encounter was
consensual," ***The Washington Post*** (July 10, 2019),
https://www.washingtonpost.com/local/virginia-politics/lawyer-for-va-lt-gov-fairfax-says-witness-will-corroborate-that-sexual-encounter-was-consensual/2019/07/10/b74039d0-a31a-11e9-bd56-eac6bb02d01d_story.html

"Virginia Lt. Gov. Fairfax says eyewitness backs up his story," ***ABC News/Associated Press***
(July 10, 2019) ("An attorney for Virginia Lt. Gov. Justin Fairfax says there's a witness who can
corroborate his story that he did not rape a woman while they were students at Duke University
nearly 20 years ago."), https://abcnews.go.com/Politics/wireStory/virginia-lt-gov-fairfax-eyewitness-backs-story-64245275

Broadcast, NYPR and Perry failed to investigate, follow up on or include the critical

information regarding the exonerating eyewitness in whose college dorm room at Duke

University in spring 2000 this fictitious assault would have occurred – as well as Fairfax's

extraordinary efforts to establish the falsity of the accusations by Tyson and Watson and to

clear his name – in its reporting. This despite the glaring fact that this Court, the Fourth

Circuit Court of Appeals, the U.S. Supreme Court12  and even CBS Corporation itself – then

---

"Eyewitness would clear Va. lieutenant governor in N. Carolina sex assault allegation, says lawyer," **WTOP** (July 10, 2019), https://wtop.com/virginia/2019/07/eyewitness-would-clear-va-lieutenant-governor-in-n-carolina-sex-assault-allegation-says-lawyer/

12  See, e.g., *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 682 (1989).

"On October 27, after the interview with Alice Thompson, the managing editor of the Journal News assembled a group of reporters and instructed them to interview all of the witnesses to the conversation between Connaughton and Thompson with one exception Patsy Stephens. No one was asked to interview her and no one made any attempt to do so. See App. 56-57, 61, 83-85. This omission is hard to explain in light of Blount's and Long's repeated questions during the Connaughton and Thompson interviews concerning whether Stephens would confirm Thompson's allegations. See id., at 277, 313, 316.

**It is utterly bewildering in light of the fact that the Journal News committed substantial resources to investigating Thompson's claims, yet chose not to interview the one witness who was most likely to confirm Thompson's account of the events.** However, if the Journal News had serious doubts concerning the truth of Thompson's remarks, but was committed to running the story, there was good reason not to interview Stephens while denials coming from Connaughton's supporters might be explained as motivated by a desire to assist Connaughton, **a denial coming from Stephens <u>would quickly put an end to the story.</u>**" (emphasis added)

See also id. at 692-693 (emphasis added).

"It is also undisputed that Connaughton made the tapes of the Stephens interview available to the Journal News and that no one at the newspaper took the time to listen to them. **Similarly, there is no question that the Journal News was aware that Patsy Stephens was a key witness and that they failed to make any effort to interview her.** Accepting the jury's determination that petitioner's explanations for these omissions were not credible**, it is likely that the newspaper's**

a defendant in a highly-publicized 2019 defamation suit by Fairfax13  involving these exact

same false allegations by Watson and Tyson – all clearly agreed – well before NYPR

<hr>

**inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of Thompson's charges.** Although failure to investigate will not alone support a finding of actual malice, see St. Amant, 390 U.S., at 731, 733, 88 S.Ct., at 1325, 1326, **the purposeful avoidance of the truth is in a different category.**

There is a remarkable similarity between this case—and in particular, the newspaper's failure to interview Stephens and failure to listen to the tape recording of the September 17 interview at Connaughton's home—and the facts that supported the Court's judgment in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In Butts the evidence showed that the Saturday Evening Post had published an accurate account of an unreliable informant's false description of the Georgia athletic director's purported agreement to "fix" a college football game. Although there was reason to question the informant's veracity, just as there was reason to doubt Thompson's story, the editors did not interview a witness who had the same access to the facts as the informant and did not look at films that revealed what actually happened at the game in question. **This evidence of an intent to avoid the truth was not only sufficient to convince the plurality that there had been an extreme departure from professional publishing standards, but it was also sufficient to satisfy the more demanding** *New York Times* **standard** applied by Chief Justice Warren, Justice BRENNAN, and Justice WHITE. As in Butts, **the evidence in the record in this case, when reviewed in its entirety, is "unmistakably" sufficient to support a finding of actual malice."**

13  See, e.g., "Lt. Gov. Fairfax files $400 million defamation suit against CBS in reporting on sexual assault claims," ("Both women gave interviews to Gayle King that aired on CBS This Morning in early April. The suit, filed in federal court in Alexandria, claims that CBS failed to 'follow up on leads that would demonstrate the allegations to be false.' **One of those concerns Fairfax's claim that a witness was present at Fairfax's sexual encounter with Meredith Watson at Duke University in 2000 and could corroborate that it was consensual.** Fairfax's lawyer went public with that claim only in July, **and a spokesman for Watson's attorney declined to respond to it at that time. The lawsuit contends that CBS could or should have known about the possibility of a witness before it aired Watson's interview."**), *The Washington Post* (September 12, 2019), https://www.washingtonpost.com/local/virginia-politics/lt-gov-fairfax-files-400-million-defamation-suit-against-cbs-in-reporting-on-sexual-assault-claims/2019/09/12/f275beb0-d56c-11e9-9343-40db57cf6abd_story.html

"Lt. Gov. Justin Fairfax of Virginia Sues CBS for Defamation, Seeking $400 Million," *The New York Times* (September 12, 2019), ("Mr. Fairfax has accused both women of fabricating their accounts. Their allegations came into view this year as Mr. Fairfax was poised to ascend to the

published The Broadcast on August 6, 2021 – that failing to investigate and follow up on this crucial information and to include it in any reporting on the accusations would plausibly constitute "actual malice" on the part of the publisher.

---

governorship of Virginia, after the current governor, Ralph Northam, faced a maelstrom after a photograph that appeared to show him in blackface surfaced. He later denied it was him. **In the lawsuit, Mr. Fairfax said CBS ignored information that undermined his accusers and failed to properly examine their allegations.**"), https://www.nytimes.com/2019/09/12/business/media/justin-fairfax-virginia-cbs-defamation.html

"Virginia Lt. Gov. Justin Fairfax Files $400 Million Lawsuit Against CBS," ("Fairfax's attorneys allege **the network didn't fully vet the accusers' claims and omitted information that would exonerate him.** The suit repeats Fairfax's claims that the women "unambiguously" expressed their consent. **The suit also alleges that a CBS lawyer who knew Fairfax from college knew the encounter with Watson was consensual because he was told about it by an eyewitness**…. The suit elaborates on some of Fairfax's past defenses. **It says Fairfax's encounter with Watson occurred in the room of a fraternity brother, who he claims was present throughout the encounter and observed an "entirely consensual encounter." The eyewitness repeated that claim with friends after it occurred, according to the complaint.** One of those friends today is a CBS attorney. He was a fraternity brother of Fairfax's and the eyewitness at Duke, according to the suit, and previously dated Watson. **The complaint, which does not name the attorney, says the lawyer knew about the eyewitness's story but was either unwilling or unable to stop the King interviews from airing. The network "failed to interview other individuals who may have been able to confirm or contradict the allegations,"** according to the complaint. The suit also reiterates Fairfax's claims that Tyson contacted him after their encounter and never mentioned the assault in public appearances."), NPR (September 12, 2019), https://www.npr.org/2019/09/12/760291624/virginia-lt-gov-justin-fairfax-files-400-million-lawsuit-against-cbs

14.     As Mr. Lee Levine of Ballard Spahr LLP clearly stated and conceded to this Court on behalf of his client CBS Corporation during a December 6, 2019, hearing on the Motion to Dismiss in the widely-covered Fairfax v. CBS, et al. defamation lawsuit:

> "In any event, Your Honor, **I will concede to you that if Fairfax's spokesperson had said, I am going to give you the name and telephone number of somebody who was an eyewitness to one of these alleged sexual assaults, who was there the entire time and will tell you that it didn't happen, if CBS didn't follow up on that, that's probably a plausible allegation of actual malice,** but that's not what happened here. They just gave [CBS] a name, and at all relevant times, could have said what I just said but didn't, willfully concealed that information."14

15.     Upon information and belief, NYPR and Perry knew about the public reports concerning the exonerating eyewitness in Watson's false accusation in the two years prior to publishing The Broadcast and/or they intentionally avoided learning about the exonerating eyewitness in those two years prior to publication.

16.     Upon information and belief, NYPR and Perry knew about the 2019-2021 defamation litigation between Fairfax and CBS and about the allegation that CBS had failed to include information about the exonerating eyewitness in its original or updated reporting prior to publishing The Broadcast.

17.     NYPR and Perry either intentionally or recklessly failed to investigate a known exonerating eyewitness in the vicious false accusation by Watson and intentionally or recklessly failed to include any of that information in its reporting on The Broadcast.

---

14  It is telling that CBS has never updated or republished its reporting concerning the allegations by Watson and Tyson against Fairfax in over three and half years since the network first aired their exclusive interviews in April 2019 or since the information about the exonerating eyewitness was reported publicly in July 2019.

18.     NYPR and Perry also either intentionally or recklessly failed to include in The Interview any of the other information about Fairfax's extraordinary efforts to establish the falsity of Watson's and Tyson's claims and his innocence. Those include his repeated, years long calls for law enforcement investigations by The FBI and the District Attorneys in Durham, NC and Boston, MA; Fairfax's having voluntarily taken, passed and released to the media and the public the results of two separate polygraph examinations administered by the exact same former FBI Agent hired by Tyson's lawyer, Debra Katz, to examine her client Christine Blasey-Ford; his defamation lawsuit against CBS which detailed those efforts, serious fabrications and inconsistencies in the accusations and the existence of an exonerating eyewitness in the Watson accusation; and his numerous public and media statements detailing facts and evidence that helped demonstrate the falsity of the allegations of both Watson and Tyson.

19.     After intentionally excluding all of this publicly available information going to Fairfax's innocence and the lack of credibility of the accusations against him and publishing and re-publishing the fabricated, false and inflammatory accusations of Watson and Tyson, NYPR and Perry only noted on The Broadcast that Fairfax "categorically denies these allegations" – which did virtually nothing to remove the sting of the lengthy recitation of the false accusations during The Broadcast or to give information about Fairfax's version of events and the reasons underlying his consistent claims of innocence.

20.     NYPR and Perry also claim that they reached out to Fairfax's office for comment on August 5, 2022 – literally the day before they aired this highly-produced radio piece rehashing salacious, years old, uninvestigated and evidence-free accusations on August 6, 2022 – and they did not hear back prior to The Broadcast. As Perry said at the conclusion of The

Interview, "We've reached out to lieutenant governor Justin Fairfax's office for comment but have yet to hear back. If we do get a response, it will be posted at thetakeaway.org."

21.     Whether or not they heard back – or had given Fairfax a reasonable enough amount of time to respond to this new, surprise broadcast in less than one day during a week that Lieutenant Governor Fairfax was in Special Session fulfilling his constitutional responsibility to preside over the Senate of Virginia, NYPR and Perry already had access to lengthy and detailed public statements responding to the allegations of Tyson and Watson, including at the time of the April 1 and 2, 2019 CBS This Morning interviews with Gayle King, which – as the Courts have noted in finding no "actual malice" against the network – were read on-air by CBS and placed on their website. Perry and NYPR could simply have read and posted the same public statements if they were interested in presenting a fair and balanced report of the same uncorroborated allegations being leveled once again on The Broadcast against Fairfax by Tyson and Watson. However, the goal was not to produce and publish a fair and balanced report. The goal was to produce an astonishingly biased and defamatory piece against Fairfax led by Tyson and her longtime friend, teacher and political supporter Perry. And, that goal was very successfully achieved.

22.     As the available facts and evidence overwhelmingly establish, the false allegations of misconduct belatedly made on a national scale by Watson and Tyson at the precise moment that Fairfax rose to national political prominence were, in fact and from the very start, a cruel hoax weaponized by political actors – and eagerly aided by the media – to attempt to destroy the life, career, family and future of Fairfax, who had never before been accused of such

misconduct in his entire 40 years of life – not through 3 statewide political campaigns in

Virginia, 2 full-field FBI background checks and 20 years of life in politics and the public eye.

23.     The suspiciously-timed and evidence-free allegations were based on decades-old,

completely consensual encounters – one in spring 2000 in the final months of Fairfax's senior

year at Duke University with an exonerating eyewitness – Mr. Dhamian Blue -- present (whom

Watson intentionally failed to disclose as she told her fabricated story on national television to

Gayle King on CBS This Morning and NYPR and Perry intentionally failed to investigate or

report on during The Broadcast) and one during the heavily security-laden 2004 Democratic

National Convention at the Democratic Presidential and Vice-Presidential Nominees' hotel –the

Boston Park Plaza Hotel – in Boston, MA.

24.     It would have been highly improbable – if not virtually impossible – for an actual

sexual assault as described for the first time 13 years later by Tyson to have occurred in that

location, time and manner and to have gone *completely* undetected, unnoticed and unreported by

every single one of the tens of thousands of law enforcement and convention staff and guests

both in the Boston Park Plaza Hotel and the surrounding areas (as opposed to a falsely

remembered,15  falsely imagined, or intentionally and retroactively fabricated sexual assault

---

15  Tyson's accounting of her recollection of the alleged 2004 assault has already shown
numerous instances of fabrication and/or provably false memories. For example, in her detailed
attorney-issued public statement issued on February 6, 2019, Tyson describes in detail that she
"met Mr. Fairfax on July 26, 2004 when he and I were working at the convention"; that she and
Fairfax "struck up a conversation on the first day of the Convention and soon realized we had a
mutual friend" and that she and Fairfax "crossed paths occasionally during the first two days and
our interactions were cordial, but not flirtatious."

As confirmed by travel records and media reports, Fairfax was not even in Boston, MA on July

wherein Tyson – who was working at the Boston Area Rape Crisis Center *at the time* and has been an outspoken and highly vocal public advocate for over 20 years with regard to issues of sexual violence and consent – falsely claims out of whole cloth 13 years later that she cried, choked, and gagged during an encounter that she described, in her own words, at one point during her nationally-televised interview with Gayle King on CBS This Morning as "completely consensual.").

25.     Tyson also has told several different and inconsistent versions over the years regarding her uncorroborated story involving her 2004 encounter with Fairfax. In addition to what is contained in her February 6, 2019, published statement, Fairfax and his team were told in March 2018 by a newspaper outlet that Tyson had previously said that "she blacked out and couldn't remember" what occurred after she participated in a consensual encounter with Fairfax. Separately, on October 4, 2018, in a 29-minute phone call from a Richmond, VA city hall employee Fairfax was informed that Tyson had (falsely) told friends of hers involved in Virginia politics that Fairfax had "shoved" her into the hotel room from the hallway and then pinned her down and forced her into a different sexual act than the one she described in her prior and subsequent statements. Additionally, in her April 1, 2019, nationally-televised interview with

---

26, 2004, the first day of the convention. He was in Raleigh, NC traveling as the personal assistant to Senator and Vice-Presidential nominee John Edwards, and he had never met – let alone interacted and conversed with – Tyson at that point.

This further underscores the critical need for independent investigation, facts, evidence, truth and the presumption of innocence. Simply saying something occurred – particularly with no corroborating evidence and under highly unusual and suspicious-timed circumstances many years later – does not mean that it actually happened.

Gayle King on CBS This Morning, Tyson told yet a different version of her story, identifying, in her words, judgment and recollection, numerous examples of mutual consent.

26.     Both belated and bizarre allegations by Watson and Tyson involve serial, evidence-free accusers who had never raised or pursued these invented allegations against Fairfax at the time or until decades later right as he was making history in being elected Lieutenant Governor and possibly being elevated to Governor of Virginia. There is <u>no competent corroborating evidence that the alleged misconduct from 22 and 18 years ago ever actually happened</u> (because, in reality, it did not). By contrast, there is substantial, competent corroborating affirmative evidence that the stories that Watson and Tyson have told about Fairfax – in their multiple, shifting versions replete with well-established fabrications, inconsistencies and impossibilities – and the misconduct they have alleged simply, factually and literally <u>did not happen</u>

27.     Facts, evidence and truth matter. And, the fact that it is Fairfax, the accused, who has for over three years demanded investigations to establish them, while Watson and Tyson, the accusers, repeatedly have told their fabricated stories to national television, radio and print media – but have actively avoided filing criminal complaints or initiating or participating in any investigation into their claims – is further evidence of the falsity of the accusations and the calculated and vicious nature of the smear campaign that has weaponized them and denied Fairfax any investigative forum finally have them adjudicated as false.

28.     In years past, both Watson and Tyson have publicly accused others of sexual assault and misconduct without also making similar public accusations against Fairfax until he

reached a level of prominence that finally made him valuable, and vulnerable, enough in the current climate to them and others to target with a fabricated and false accusation. \

29.     Watson and Tyson each made up their false accusations against Fairfax for their own individual reasons – and for over three and a half years now *have not wanted anyone or any entity to investigate those seemingly serious accusations to determine if they are in fact true or false*. However, an astonishing number and array of people and entities, including NYPR and Perry, helped Watson and Tyson spread and promote those false and baseless accusations to a worldwide audience – immediately and then for years thereafter – even as evidence mounted that the evidence-free claims had serious credibility issues and likely were not true. The truth was never their goal. Smearing Fairfax's name and reputation, nefariously blocking him from becoming Governor of Virginia – to make way for others – and attempting to continue to destroy for the future what Fairfax and his family had worked their entire lives to achieve and build and forever derail his political and professional career, no matter the costs, was the goal.

30.     A political smear campaign of this scale, scope and purpose can only succeed if, first, the lies are sufficiently vicious and outrageous and, second, those lies are platformed, broadcast and repeated in the media – uninvestigated and uncorrected – as many times as possible to as large and diverse an audience as possible. NYPR and Perry – who has boasted about having been a teacher and close friend of Tyson for decades and to having actively supported and financially contributed to Tyson in her run for political office in California in 2019-2020 – were more than eager to play this role in adding oxygen to and continuing the smear campaign against Fairfax even as late as August 6, 2021 (well after overwhelming evidence had been widely-reported for years showing the February 2019 accusations by Watson

and Tyson to be false and lacking in credibility). This, even as Fairfax sought to quietly serve

Virginians during the remaining several months of his term as Lieutenant Governor and begin his

return to his private sector legal career and private life.

31.    Tyson and Watson – after years of doing incalculable damage with their

fabricated claims, media smear campaign and avoidance of any investigation of their accusations

– could not resist the urge to slander and defame Fairfax unchecked yet again as he exited public

office, and NYPR and Perry were just as eager to join in and provide them the large platform and

completely unchecked opportunity on The Broadcast to do just that.16

32.    For more than three and half years since first making their uncorroborated, out-of-

the-blue and suspiciously-timed allegations public in February 2019 at the precise moment it

appeared Fairfax would ascend to Virginia's governorship as a result of a racist photo scandal

involving then-Governor Ralph Northam, both Watson and Tyson – and their attorneys Nancy

Erika Smith and Debra Katz -- have intentionally and conspicuously avoided any and all

investigations – by law enforcement, the media, and law firms – into their fictitious claims. They

have avoided those investigations for three and a half years despite the glaring and hypocritical

fact that attorneys Smith and Katz have adamantly fought for law enforcement investigations

regarding many other cases of alleged sexual assault.

---

16 During her interview with Perry, Tyson republished her defamatory per se allegations against
Fairfax and made new ones as well. And, while Watson was not reinterviewed and has not made
a public statement regarding her false allegations in over three and half years since Fairfax called
for prosecutors to investigate her claims on April 3, 2019, Watson has consistently and tacitly
permitted the continuous republication of her allegations and prior interviews and has thus
enabled the smear campaign to continue unchecked even as evidence has emerged that the
accusations are false and unsubstantiated.

33.     Nancy Erika Smith, the attorney for Meredith Watson, has adamantly and publicly called for years for law enforcement, including the FBI, to investigate accusations of sexual assault.

34.     For example, when publicly commenting on the sexual assault allegations against then-Supreme Court nominee Brett Kavanaugh in the fall of 2018 (mere months before her client's public allegations were made against Fairfax in February 2019), Smith wrote:



Answer the question: why don't you want FBI investigation???

4:02 PM · 9/27/18 · Twitter for iPhone

 **Nancy Erika Smith**
@nancyerikasmith

· · ·

No, GOP Interrogator, we're having a
hearing today because GOP refused to
allow full FBI investigation & won't
subpoena Mark Judge or allow other
witnesses.

2:13 PM · 9/27/18 · Twitter for iPhone

 **Nancy Erika Smith**
@nancyerikasmith

· · ·

Grassley: letter asking for FBI
investigation from ABA PRESIDENT
doesn't represent the organization?
Your are so shameless. You must think
Americans are stupid!

10:59 AM · 9/28/18 · Twitter for iPhone

27

35.     That is because any thorough independent review of the facts, the demonstrable evidence of falsity and unreconciled and unreconcilable inconsistencies in their stories and the numerous political actors who have promoted and benefited from the weaponization of these fabricated claims against Fairfax would finally bring the smear campaign against Fairfax to light and to an end. Instead, they want the smear campaign against Fairfax to go on unchecked forever with no accountability for anyone involved with their vicious and sustained lies that have wrought so much damage for so many.

36.     In contrast to Watson's and Tysons's purposeful years long avoidance of any investigative scrutiny of their claims, Fairfax has demanded from Day One to have these uncorroborated allegations thoroughly and independently investigated – and resolved – by law enforcement, the media, law firms, the courts and any other entity **who would finally reveal the truth: that Watson and Tyson fabricated their allegations** and that many people and entities – for political and other reasons – eagerly and fully participated in platforming and promoting those vicious false claims without ever caring about whether or not they were true. They also did not care about the incalculable damage that this unconscionable course of action has caused to Fairfax, his family and friends, the Commonwealth of Virginia, the public's trust in media, our civil and criminal legal system, our political institutions or to actual survivors of sexual assault who are unfairly harmed when false and fabricated allegations – like those made by Watson and Tyson against Fairfax – are weaponized in such a cynical, highly public and politicized manner where publicity is sought and not truth or justice.

37.     Since February 2019, Fairfax has demanded to have these law enforcement and other investigations for a very simple reason: He is innocent, and he wants to finally clear his –

and his family's – name of these vicious false accusations. Fairfax has taken other extraordinary

steps to do just that – voluntarily taking and passing two lie detector tests administered by the

same former FBI Agent hired by Tyson's attorney Debra Katz for her client Christine Blasey-

Ford, filing a federal defamation lawsuit against CBS Corporation in 2019 for its airing of

defamatory interviews of Watson and Tyson by Gayle King and *CBS This Morning*, and recently

meeting with the FBI for three hours with no lawyer present to further establish the facts and his

innocence.

38.     Upon reviewing many of those steps and what it called "inconsistencies" in the

allegations by Watson and Tyson that had become clear in the 18 months since they first made

their false allegations public and sought a worldwide audience, The Washington Post Editorial

Board on July 24, 2020, wrote a piece asking pointedly if Fairfax was "a victim of false

accusations and a rush to judgment." Two years later on August 1, 2022 as Watson and Tyson

glaringly continued to avoid any investigation – but also continued to regularly pursue

opportunities to publicly smear and defame Fairfax with the eager help and participation of a

willing media – The Washington Post Editorial Board followed up and made this extraordinary

observation: "We can't think of another prominent man accused of sexual assault who has gone

to such lengths – practically begging – for an investigation, which would put him at some risk."

39.     NYPR and Perry did not care at all about these extraordinary efforts by Fairfax to

clear his name, as they have never reported any of them. They also did not care about the

exculpatory evidence – including an exonerating eyewitness in the false allegation involving

Watson – as they have never reported on that.

40.     Watson's encounter with Fairfax took place in the Spring of 2000 at Duke University ("Duke") when both were undergraduate students. Fairfax was a 21-year-old college senior and Watson was an approximately 20-year-old college junior. Tyson's encounter with Fairfax occurred during the Democratic National Convention in Boston in July 2004 when Tyson was 27 years old, and Fairfax was 25 years old. Both encounters were entirely consensual. Yet, 19 and 15 years later, respectively, Watson and Tyson falsely and publicly claimed they had been sexually assaulted by Fairfax, just as Fairfax was poised to ascend to the Governorship of Virginia following a blackface photo scandal affecting current Governor Ralph Northam. The timing and circumstances of these false and salacious allegations demonstrate that it was a political hit job—a deliberate and calculated effort to permanently harm Fairfax's political and professional career and to attempt to prevent him from becoming Governor of Virginia.

41.     Tyson's fabrications against Fairfax were politically-motivated. Her communications with a well-connected friend involved in Virginia politics reveal that she instigated and fostered a deliberate plan to defame Fairfax on the same weekend that a scandal broke that led to calls for Governor Northam's resignation. In reality, Tyson knew that Fairfax did not assault her. Indeed, after their entirely consensual sexual encounter 15 years ago, Tyson reached out to Fairfax on multiple occasions to maintain contact. At one point during that period of time, Tyson called Fairfax and asked if she could visit him socially in New York City – where he was then a law student at Columbia Law School – and introduce him to her mother. Fairfax never responded to that request and has not seen or spoken with Tyson since.

30

42.     Tyson, a California resident, has stated that she does not want an independent law enforcement investigation into her allegation, and instead has pushed for Fairfax to resign his public office as Lieutenant Governor of Virginia.

43.     Watson's motive also appears politically-motivated in that she sought to air her false allegation in the Virginia General Assembly and continues to avoid any independent law enforcement investigation of her claim. Watson also has alleged that she was raped by a Duke University athlete ("Duke Athlete") a year before she alleges she was raped and sexually assaulted by Fairfax. Watson, a Maryland resident, likewise has not sought an independent law enforcement investigation into either her allegation against the Duke Athlete or against Fairfax and instead has also pushed to have Fairfax resign his public office as Lieutenant Governor of Virginia.

44.     In April 2019, nearly two months after Watson and Tyson first went public with their false allegations in February 2019, CBS aired their interviews despite having ample opportunity and resources to investigate the veracity of their stories. CBS also had information both before and after publishing these defamatory interviews indicating that both allegations had not been corroborated by any independent investigation. Yet, CBS recklessly disregarded whether what Watson and Tyson were saying was, in fact, true.

45.     That CBS chose to air these false claims of sexual assault is not surprising. Since 2017, CBS had been publicly excoriated with its own #MeToo scandals involving several high-ranking figures at the network, including *CBS This Morning* Co-Anchor Charlie Rose, former *CBS News* Chairman and former Executive Producer of *60 Minutes* Jeff Fager and former CBS CEO Les Moonves. Upon information and belief, in the immediate aftermath of those high-

profile #MeToo scandals, the network sought to visibly align itself on the side of perceived

victims to improve its public image. Consequently, Gayle King and her *CBS This Morning* team

intentionally failed to investigate leads—some provided directly to CBS by Fairfax's team prior

to the stories being aired on the network—that would have placed the truthfulness of Watson's

and Tyson's stories in serious doubt. CBS also made sure that Watson's story was not seriously

challenged during the on-air interview by agreeing to a pre-interview of Watson in the presence

of Watson's lawyer. Once aired, CBS refused to correct the accusations made against Fairfax,

despite numerous specific requests to update its reporting and despite having exculpatory

information in the public record and elsewhere.

    46.    Before and after airing the interviews, CBS had information that these accusations

were false. In particular, Fairfax's team sent CBS News Political Correspondent Ed O'Keefe,

who was reporting on allegations against Fairfax, a text on February 8, 2019, urging him to

contact, among other people, a current CBS lawyer who was a Duke classmate of Watson's and

Fairfax's. This lawyer had information all along that Fairfax did not rape or sexually assault

Watson.

    47.    Given its own significant problems with #MeToo scandals, CBS had a clear

agenda and media bias in seeking to support #MeToo accusers in its reporting on the sexual

assault and rape allegations made by Watson and Tyson against Fairfax. As a result of that bias,

CBS abandoned sound, standard journalistic practices that would have revealed fabrications,

inconsistencies, and provably false statements made by Watson and Tyson and undermined the

credibility of their stories. CBS intentionally did not ask Watson and Tyson basic factual

questions meant to "pressure-test" the veracity of their allegations. Instead, it went into the

stories with a preconceived narrative in mind—that Fairfax was guilty—and did everything possible to make sure the aired interviews were consistent with that narrative.

48.     For example, despite being urged by Fairfax's spokesperson prior to the taping of the interview, CBS never asked Watson on-air (a) the date of the alleged assault, (b) in which room the alleged assault occurred, (c) who resided in that room, or (d) whether Watson encountered anyone other than Fairfax upon entering or exiting the room or building. This was a crucially important line of questioning since Fairfax did not live in that building during that academic year, and it was later revealed that there was an eyewitness present during the consensual encounter between Watson and Fairfax. That eyewitness has stated to multiple people that he was in the room and that Fairfax did not rape or sexually assault Watson. Watson did not mention an eyewitness in her interview with King or at any other time.

49.     Exacerbating CBS' reckless disregard for the truth and failure to follow even basic journalistic standards were the wholly uninformed on-air comments by CBS on-air personnel during the segments in which CBS aired Watson's and Tyson's defamatory statements. On April 1 and 2, various CBS reporting staff, including King, Norah O'Donnell, John Dickerson and Bianna Golodryga made comments on-air accepting as fact and vouching for the credibility of the stories told by Watson and Tyson without *any* independent investigation or objective basis in fact. Their commentary is further evidence that CBS acted with actual malice against Fairfax and that CBS was more interested in appearing to take the side of alleged #MeToo victims than in reporting objectively on the facts and establishing the truth or falsity of the allegations made by Watson and Tyson.

50.     As a result of CBS' reckless airing of the false and defamatory statements, Justin Fairfax is now falsely labeled a "rapist," "predator" and "sexual abuser." CBS' actions have exposed millions of people to lies that have done extraordinary damage to his reputation and his ability to earn a living. His once-promising career – a lawyer at top firms, former federal prosecutor, Lieutenant Governor of Virginia, candidate for Governor of Virginia for 2021 – has been severely damaged. Fairfax had little choice but to relinquish his partnership at Morrison & Foerster, a top international law firm at which he would have earned millions of dollars over the years. His wife and two young children cannot escape having to hear these vicious false stories and taunts about their husband and father whom they love dearly. This harm is a direct and proximate result of the intentional and reckless publishing and propagation by CBS of patently false allegations by Watson and Tyson of rape and sexual assault.

51.     Fairfax also seeks compensatory and punitive damages for the extreme harm that the Defendants NYPR and WNYC have jointly and severally caused. He also seeks to enjoin Defendants from continuing to publish these defamatory interviews and statements.

**PARTIES**

52.     Plaintiff Justin Fairfax is an individual and resident of the Commonwealth of Virginia, who lives in Fairfax County. He has been married since 2006 to his wife Cerina, a dentist with her own practice in Fairfax County. Together they have a son and a daughter, ages nine and eight, respectively. Since his 2005 graduation from Columbia Law School where he was selected to the prestigious *Columbia Law Review*, Justin has enjoyed an extraordinarily successful career in law and public service. Fairfax clerked for the Honorable Gerald Bruce Lee in the Eastern District of Virginia ("EDVA"). He worked at prestigious firms such as

WilmerHale LLP, Venable LLP and Morrison & Foerster LLP, the latter of which he served as a partner. In 2013, Fairfax was named as one of the "Nation's 40 Best Advocates Under 40 Years Old" by the National Bar Association. From 2010 to 2012, Fairfax served as an Assistant United States Attorney for EDVA in the Major Crimes & Narcotics Unit in the Alexandria Division. He also was appointed Deputy of the Northern Virginia Human Trafficking Task Force. Fairfax passed two separate FBI background checks in 2005 and 2010, respectively, and he was granted a "Top Secret" security clearance by the federal government. Fairfax left his position as an AUSA in 2012 to run for Attorney General of Virginia—a race in which he won more than 48% of the statewide primary vote and was endorsed by *The Washington Post* in his first-ever election. In 2017, he was elected as Lieutenant Governor of Virginia with 1.36 million votes— the most ever for that position in the history of the Commonwealth of Virginia. Prior to the false and defamatory allegations against him, Fairfax had served as a member of the Duke University Board of Trustees, the Duke University Sanford School of Public Policy Board of Visitors, and as Chair of the Democratic Lieutenant Governors Association ("DLGA").

53.      Fairfax served as Lieutenant Governor of Virginia—a part-time position for which he is paid approximately $36,000 per year—until his four-year term ended in January 2022. On January 14, 2022, the Richmond Times-Dispatch published a piece titled, "Va. Senators praise Lt. Gov. Justin Fairfax, who presided over their chamber for four years." As the paper wrote, "On his final day in office presiding over the state Senate, lawmakers from both parties praised Lt. Gov. Justin Fairfax as a friend and extraordinary leader with a good sense of humor, an expert on the rules, and someone they'll miss." One senator said directly: "Mr.

President, many people have been in your role over the hundreds of years of our commonwealth. I don't think anybody's ever done the job better."17

54.     Defendant New York Public Radio is a New York corporation with its principal place of business at 160 Varick Street, New York, New York 10013.

55.     Defendant WNYC is a New York corporation with its principal place of business at 160 Varick Street, New York, New York 10013. WNYC, New York's flagship public radio station, is a wholly owned subsidiary of New York Public Radio. WNYC broadcasts online and via podcast to a worldwide audience and to 300 public radio stations across the United States of America, including at least four stations located in Virginia (WLUR – Lexington, VA, 91.5 FM; WVRU – Radford, VA, 89.9 FM; WVFT Radio IQ – Richmond, VA, 92.5 FM; and WVFT Radio IQ – Richmond, VA, 103.7). In 2018, WNYC achieved record audience levels, averaging nearly 1 million listeners per week. "The Takeaway" is a news and interview program broadcast by WNYC. On August 6, 2021, Melissa Harris-Perry was the interim host of "The Takeaway," and she later became the permanent host of the news program.

---

17 "Va. senators praise Lt. Gov. Justin Fairfax, who presided over their chamber for four years," **Richmond Times-Dispatch** (Jan. 14, 2022), https://richmond.com/news/state-and-regional/va-senators-praise-lt-gov-justin-fairfax-who-presided-over-their-chamber-for-four-years/article_524c2f1b-ac5a-548e-b4ff-090ff17dd634.html#tncms-source=login

## JURISDICTION AND VENUE

56.    This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332(a) as there exists complete diversity of citizenship between the Plaintiff and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

57.    This Court has personal jurisdiction over the Defendants pursuant to Va. Code § 8.01-328.1 et seq.

58.    NYPR is subject to personal jurisdiction in Virginia because it transacts business in Virginia, knowingly, and with reckless disregard for the truth, published and republished false and defamatory statements concerning a Virginia resident who was harmed by the Defendants in Virginia and published and republished the false and defamatory statements in Virginia and to residents of Virginia. Upon information and belief, NYPR has contracted to supply goods or services in Virginia, has four affiliate television stations in Virginia, and generates income from its business in Virginia.

59.    WNYC is subject to personal jurisdiction in Virginia because it transacts business in Virginia, knowingly, and with reckless disregard for the truth, published and republished false and defamatory statements concerning a Virginia resident who was harmed by the Defendants in Virginia and published and republished the false and defamatory statements in Virginia and to residents of Virginia. Upon information and belief, NYPR has contracted to supply goods or services in Virginia, has four affiliate television stations in Virginia, and generates income from its business in Virginia.

60.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the harms suffered by Plaintiff occurred primarily in the Eastern District of Virginia and because all Defendants are subject to personal jurisdiction in this District.

**<u>FACTS</u>**

***Watson and Fairfax Had an Entirely Consensual Sexual Encounter as
College Students in the Spring of 2000***

61.     In the spring of 2000, Watson and Fairfax were both undergraduate students at Duke and had been friends for some time.

62.     Fairfax was a 21-year-old senior at the time. Watson was an approximately 20-year-old junior at the time.

63.     One evening that spring, Watson, Fairfax and a third person (the "eyewitness" or "Dhamian Blue") had gathered in the eyewitness' fraternity house dorm room. Watson had visited that building and that specific room many times during her years at Duke.

64.     Fairfax did not reside in the eyewitness' building that academic year. At the time, Fairfax was a residential advisor and living in a different dormitory on Duke's campus.

65.     With the eyewitness still in the room, Watson initiated a sexual encounter with Fairfax.

66.     Throughout the entire sexual encounter, Watson unambiguously manifested her consent.

67.     The eyewitness remained in the room throughout the entire sexual encounter.

68.     After the encounter, Fairfax left the room and Watson remained in the room with the eyewitness.

38

69.     Watson never indicated to Fairfax or the eyewitness that the sexual encounter with Fairfax was not consensual during or after the encounter with Fairfax.

70.     Watson has never mentioned that there was an eyewitness present during her encounter with Fairfax, including during her April 2 interview with King on *CBS This Morning*, nor has she ever suggested that someone else participated in the assault she alleged.

71.     Watson also has never specified in whose room her encounter with Fairfax took place.

72.     As recently as February 2019, Fairfax and Blue discussed this encounter and their recollections of it were identical: Watson and Fairfax had a consensual sexual encounter in the eyewitness' room with the eyewitness present the entire time.

73.     Since February, the eyewitness has discussed this encounter with several of the eyewitness' friends on numerous occasions, including a lawyer for CBS. The account has not changed: Watson and Fairfax had an entirely consensual sexual encounter initiated by Watson in the eyewitness' room 19 years ago as college students.

### *Tyson and Fairfax Had an Entirely Consensual Sexual Encounter at the Democratic National Convention in July 2004*

74.     For several weeks during the summer of the 2004 presidential election, Fairfax served as the personal aide or "body man" to then-Democratic vice-presidential candidate Senator John Edwards of North Carolina. This included the week of the Democratic National Convention that took place in Boston in late July 2004.

75.     Fairfax traveled on the same airplane with Edwards to the Democratic National Convention in Boston.

76.     Fairfax arrived in Boston from Raleigh, North Carolina, with Senator Edwards on Tuesday, July 27, 2004.

77.     On July 28, 2004, after only knowing each other for less than 24 hours, Tyson agreed to join Fairfax in his hotel room. Many who attend such conventions regularly are aware that such personal connections are not uncommon.

78.     Upon information and belief, a fellow campaign staffer shared Fairfax's room, and the room was on a secure floor accessible only to properly-credentialed staff and their guests. The roommate was not present during this sexual encounter, but always had a key to the room.

79.     Tyson and Fairfax engaged in completely consensual sexual activity in Fairfax's hotel room.

80.     Throughout the encounter in Fairfax's hotel room, Tyson unambiguously manifested her consent to engage in the consensual activity.

81.     At no time during or after the encounter did Fairfax force Tyson to do anything and at no time during or after the encounter did Tyson indicate that Fairfax forced her to do anything.

82.     At no time did Tyson cry, gag, or choke while in Fairfax's hotel room.

83.     Tyson stayed in Fairfax's hotel room following the sexual encounter, made no effort to leave the hotel room although she was free at any time to do so, and engaged in friendly conversation with him.

84.     Tyson and Fairfax left the hotel room together. Upon information and belief, Fairfax and Tyson would have had to pass campaign staff and security personnel on the secure

hotel floor before departing each other's company and such staff and personnel would have been attuned to any distress on the part of any person they encountered.

85.     In the weeks following their completely consensual sexual encounter on July 28, 2004, Tyson and Fairfax remained in touch.

86.     At one point, Tyson left a voice message for Fairfax asking if he would like her to visit him in New York City—where he was then attending Columbia Law School—and meet her mother. Fairfax never responded to that message and never saw or spoke with Tyson again.

87.     During the time they were in contact, Tyson never indicated to Fairfax that she believed their encounter to be anything other than entirely consensual. She has never contacted Fairfax about any issue in the previous 14 years, except as alleged above.

### Fairfax Becomes Lieutenant Governor and the Northam Scandal Breaks

88.     Fairfax graduated Columbia Law School in 2005 and has enjoyed a highly-successful legal and political career to date.

89.     In early May 2016, Fairfax announced his candidacy for Lieutenant Governor of Virginia. On November 7, 2017, he was elected Lieutenant Governor of Virginia, becoming the second African American ever elected to statewide office in Virginia's history. His candidacy and subsequent election received widespread national media coverage.

90.     Fairfax assumed office as Lieutenant Governor on January 13, 2018. As Lieutenant Governor, he is first-in-line to become Governor of Virginia should current Governor Ralph Northam no longer serve in office.

91.     Because Virginia Governors are prohibited by the Virginia Constitution from serving consecutive terms, Governor Northam could not run for re-election in 2021. Therefore,

as a statewide office holder, Fairfax is naturally considered a top contender for Governor of Virginia in the 2021 gubernatorial election.

92.     In September 2018, Fairfax joined the law firm Morrison & Foerster as a partner in its Northern Virginia office in Tysons Corner. As partner, he earned a substantial salary, commensurate with his unique legal skill set, experience, and business development acumen.

93.     On Friday, February 1, 2019, a photo from Governor Northam's medical school yearbook surfaced purportedly showing Governor Northam either in blackface or in a Ku Klux Klan hood. Calls for Governor Northam to resign came almost immediately.

94.     On February 1, 2019, the *Richmond Times-Dispatch* published an editorial titled "Northam Must Resign."

95.     The *Times-Dispatch* is effectively the newspaper of record for Virginia politics and is widely read across the state.

96.     In the editorial, the newspaper explained that the racist images that had been uncovered on Northam's medical school yearbook page had "injure[d]" Northam's "standing and reputation beyond repair" and revealed "poor judgment" that "has undermined his standing with Virginians in ways that we believe will permanently impair his ability to act as an effective governor."

97.     The editorial called on Northam to resign. It also demanded that Northam "should, for the good of Virginia, step down from its highest office and allow Lt. Gov. Justin Fairfax to succeed him."

98.     Had Governor Northam resigned as a result of this scandal in February 2019, Fairfax would automatically have become Governor of Virginia by operation of the Virginia

42

Constitution, becoming the only African American Governor in the entire United States of America. Also pursuant to the Virginia Constitution, Fairfax would have been eligible to run for a full term as Governor in the 2021 gubernatorial election.

### Tyson Makes Her False and Defamatory Allegation Against Fairfax Through Political Rivals to Try to Stop Him from Becoming Governor of Virginia

99.     On the Sunday following the breaking of the scandal involving Governor Northam (February 3, 2019) and widespread calls for Northam to resign and for Fairfax to succeed him as Governor, a conservative website called "Big League Politics" published a supposedly private Facebook message from Tyson stating that she was assaulted at the 2004 Democratic National Convention in Boston by someone who was about to receive a "VERY BIG promotion" in Virginia.

100.    On Monday, February 4, 2019, Tyson's allegation was first reported by national mainstream media outlets, including *The Washington Post*, which wrote in its initial piece that it "could not find anyone who could corroborate" her version of the allegation and did not have "the ability to corroborate [Tyson's] account—in part because she had not told anyone what happened."

101.    It was no accident that Tyson's private message ended up in the mainstream media, as this had been the plan all along.

102.    Tyson's private message had been captured and forwarded on by Adria Scharf.

103.    Scharf is no stranger to Virginia politics. She is the wife of Thad Williamson, who is currently running for a City Council seat in Richmond, Virginia. Williamson was an advisor to current Richmond Mayor Levar Stoney and the two remain close friends. As a candidate,

Williamson is supporting a major redevelopment project in downtown Richmond that is being promoted heavily by Stoney. Upon information and belief, Williamson is also a longtime friend and former schoolmate of Tyson. Stoney, who publicly expressed interest in running for Lieutenant Governor of Virginia in 2017 and Governor of Virginia in 2021, views Fairfax as a political rival who has been positioned to delay Stoney's desired run for Governor. Fairfax had indeed been warned in the fall of 2018 that should Fairfax announce his intention to run for Governor in 2021, Stoney, Williamson, and Scharf intended to promote a supposedly damaging, uncorroborated accusation against Fairfax involving Tyson in an attempt to harm Fairfax personally and professionally and to derail his political future.

104.    Stoney previously served as Deputy Campaign Manager and later Secretary of the Commonwealth to former Virginia Governor Terry McAuliffe. Both Stoney and McAuliffe are rumored to be potential candidates for Virginia Governor in 2021 and thus have reasons to attempt to thwart Fairfax's political career. Upon information and belief, McAuliffe was the first major elected official in Virginia to call for Fairfax's resignation as Lt. Governor.

105.    Upon information and belief, Tyson and Scharf communicated about the Facebook post in the immediate aftermath of the Governor Northam scandal breaking and the *Times-Dispatch*'s February 1 call for Northam's resignation and for Fairfax to succeed him as Governor. On February 2, 2019, Tyson agreed to allow Scharf to share the post with a group of progressive activists in Virginia.



106.    After Scharf told Tyson that she had shared the post on February 2 via the encrypted messaging app "Signal" with "a large group of progressive activists in Richmond," Tyson thanked her and expressed her appreciation for both Scharf and her husband, Thad Williamson.



107.    On Sunday, February 3, 2019, Scharf sent an urgent message to Tyson alerting her that **"[N]ortham may be forced to resign tomorrow."** Northam's resignation would immediately have elevated Fairfax to Virginia's governorship. Because of this development, Scharf implored Tyson that **"Thad and I think your story should get to the local press TODAY, rather than later."** Scharf's text made clear that this encouragement was from Scharf *and* her husband, Mayor Stoney advisor Thad Williamson. Tyson agreed to allow Scharf to share her post with reporters and stated that if reporters wanted to contact her, Scharf could provide the reporters with Tyson's email address. Tyson provided Scharf with an email address for reporters to reach her.

46



108.    Scharf's message forwarding Tyson's message to a group of activists appears to have used an encrypted messaging app and was titled, "Monday Action."



109.    In addition to publishing Tyson's Facebook message, the conservative website suggested Fairfax as her alleged assailant, titling its post: *Stanford Fellow Hints at Possible Justin Fairfax Sex Assault* (https://bigleaguepolitics.com/stanford-fellow-hints-at-possible-justin-fairfax-sex-assault/).

110.    On February 6, Tyson publicly confirmed that she had authored the "private" Facebook message in question. In a statement published through her lawyer on that date, Tyson wrote that the encounter involved "consensual kissing" and that Fairfax's advances were "not unwelcome."

111.    She also stated that:

What began as consensual kissing quickly turned into a sexual assault. Mr. Fairfax put his hand behind my neck and forcefully pushed my head towards his crotch. Only then did I realize that he had unbuckled his belt, unzipped his pants, and taken out his penis. He then forced his penis into my mouth. Utterly shocked and terrified, I tried to move my head away, but could not because his hand was holding down my neck and he was much stronger than me. As I cried and gagged, Mr. Fairfax forced me to perform oral sex on him. I cannot believe, given my obvious distress, that Mr. Fairfax thought this forced sexual act was consensual. To be very clear, I did not want to engage in oral sex with Mr. Fairfax and I never gave any form of consent.

112.    Once she went public in February 2019, Tyson called for hearings against Fairfax in the Virginia General Assembly and demanded his resignation as the duly-elected Lieutenant Governor of Virginia. Unlike Fairfax, she has not called for any criminal investigation.

113.    Tyson has long been a public and outspoken advocate regarding issues of sexual violence and sexual assault. She has spoken publicly on this topic on numerous occasions over the years both before and after her consensual encounter with Fairfax in 2004.

48

114.    Even after Fairfax became a well-known public figure running for Attorney General of Virginia in 2013, announcing his candidacy for Virginia Lieutenant Governor in May 2016 and then winning the June 2017 primary and November 2017 general election to be Virginia's Lieutenant Governor, Tyson never mentioned this supposed assault in repeated public appearances and interviews.

115.    For example, during an October 20, 2016, Facebook live video, Tyson says she "loved her many years in Boston" and mentions "recent accounts of sexual assault" and (likely referring to Donald Trump) "grabbing people" but says nothing about a supposed personal experience related to the topic. As of August 19, 2019, that Facebook live video was available at: https://www.facebook.com/TNRStudio/videos/1684938978488626/ and the relevant statements start at 24:36 in the video.

116.    During a podcast posted on YouTube on April 14, 2017, Tyson stated, "I started a program teaching self-esteem for girls in lockup. I started it because I had been working—I was one of the founding members of the Survivors Speaker's Bureau for the Boston Area Rape Crisis Center and I toured all over New England—my father was a convicted pedophile…I toured all over New England talking about what had happened to me as a child and how it affected me as a kid and how it affected me as an adult." Tyson never mentions being sexually assaulted as an adult. As of August 19, 2019, that podcast was available on YouTube at: https://www.youtube.com/watch?v=0m3mQIzfCqg&app= desktop and the relevant statements start at 42:11 in the video.

117.    On December 12, 2017, Tyson appeared on an NPR Wisconsin Public Radio broadcast to speak about "sexual misconduct in Washington." During that lengthy interview, she

never once stated that she had been sexually assaulted at the 2004 Democratic National

Convention in Boston. As of August 19, 2019, that interview was available at: https://www.wpr.

org/trump-accusers-hold-press-conference-asking-investigation.

118.    On October 6, 2018, Tyson moderated a public roundtable discussion titled

"#MeToo" at her alma mater, Princeton University, during the school's "She Roars" Women's

Conference. Tyson said nothing during the roundtable discussion about her allegation or about

having been sexually assaulted by Fairfax at the 2004 Democratic National Convention in

Boston.

119.    Upon information and belief, Tyson took her false allegation against Fairfax to

*The Washington Post* in the fall of 2017, after the November 7, 2017, general election won by

Fairfax for Virginia Lieutenant Governor and before his inauguration in January 2018.

120.    *The Washington Pos*t investigated Tyson's story for several months and made the

decision in March 2018 not to publish her story.

121.    After failing in her late-2017 effort to harm Fairfax's political career, Tyson

picked a second politically-opportune time to air her false allegations. This time, she emerged in

early February 2019, the very same weekend that the media was reporting that Fairfax would be

elevated to the governorship of Virginia if Governor Northam stepped down in light of the

blackface scandal.

122.    Although Tyson's false allegation against Fairfax generated significant publicity

in February 2019, it was Tyson's April 2019 interview with CBS that reached a massive national

audience, which was different and far larger than the audience than had been reached through her

February 2019 written statement made through her lawyer.

123.     Tyson's statement in February 2019 and interview with CBS in April 2019

contained several falsehoods, all of which were intentionally fabricated, including the following:

a.      In her February 6, 2019, statement, Tyson falsely claimed that she met Fairfax on "July 26, 2004" "the first day of the Convention" apparently in an attempt to convey the impression that she knew Fairfax for a longer period of time than she actually did before joining him in his hotel room. In fact, Fairfax was in North Carolina with Senator Edwards on July 26, 2004, and did not arrive to Boston until the following day.

b.      In her February 6, 2019, statement, Tyson falsely claimed that Mr. Fairfax committed "sexual assault," he "forcibly pushed my head towards his crotch," he "forced his penis into my mouth," and he "forced me to perform oral sex on him." These statements are all false. The sexual encounter was entirely consensual. Fairfax at no time used any force on Tyson whatsoever.

c.      In her February 6, 2019, statement, Tyson falsely claimed that she "cried" and "gagged" during the encounter. This is false. She did not cry, gag or give any indication during or after the encounter that it was not consensual.

d.      In her April 1 interview with King, Tyson said, "my neck didn't work" and "I couldn't feel my neck" in describing how she went from consensual kissing on the hotel bed to engaging in oral sex. This claim is false and indeed is contradicted by prior statements and accounts given by Tyson.

e.      In that interview, Tyson was asked if she had told Fairfax that she was a survivor of incest to which she replied, "Um…yes, actually…yes." This statement is false. In the less than 24 hours that Fairfax knew Tyson, she never stated or relayed in any way that she was a survivor of incest or of any form of sexual assault.

f.      In that interview, Tyson stated that she never contacted Fairfax again after their encounter in Boston. That is false. Fairfax and Tyson remained in touch in the weeks and months following their encounter, and Tyson, at one point, left a voice message for Fairfax stating that she wanted to visit him socially in New York City—where he was then a third-year student at Columbia Law School—and that she wanted to introduce Fairfax to her mother. Fairfax never replied to that message and has not spoken to or seen Tyson in person since.

51

g. In that interview, Tyson also said that Fairfax "was grabbing my neck" and "pushing down and pushing down until my head was literally in his crotch." This claim is false. At no time did Fairfax grab Tyson's neck or push her head in any way. Tyson initiated the act of oral sex and willingly and voluntarily performed it.

h. Tyson's and Fairfax's entire sexual encounter was consensual. Her express and implied uncorroborated statements to the contrary are false.

**Watson Makes Her False and Defamatory Allegation Against Fairfax Just Two Days After Tyson Reveals Her False and Defamatory Allegation**

124. Shortly after 1 p.m. on February 8, 2019, Watson's attorney, Nancy Erika Smith, sent a letter to Fairfax's legal counsel alleging that Fairfax raped Watson in 2000 when they were both undergraduate students at Duke University. Smith and Watson called for Fairfax's resignation as Lieutenant Governor of Virginia and demanded a response by 3 p.m. that same day—less than two hours later—implying clearly that the information would not be made public if Fairfax resigned within less than two hours.

125. Faced with what was an inappropriate threat, Fairfax's counsel did not respond to the letter. Later that afternoon, Watson, through Smith and a professional public relations firm, announced publicly that she had been raped by Fairfax at Duke in the spring of 2000.

126. Watson alleged that the alleged assault occurred in a room at the Alpha Phi Alpha fraternity house on Duke's campus.

127. Watson did not state that anyone else was in the room, nor did she say in whose room the alleged assault occurred.

128. Watson also later stated that she had been raped by the Duke Athlete during the 1998-1999 academic year. Watson claims she told an "official" at Duke that the Duke Athlete had raped her, and that the official discouraged her from reporting the rape. To this date, Watson

and her attorney have refused to give the name of the official at Duke to whom Watson claims to have reported a rape by the Duke Athlete.

129.    Duke has stated publicly that the university first became aware of Watson's claim that the Duke Athlete raped her when she went public with that allegation in February 2019.

130.    Upon information and belief, the Duke Athlete has never been prosecuted for this supposed assault and has repeatedly and categorically denied the accusation. Upon information and belief, there is no evidence corroborating Watson's claim that she was raped by the Duke Athlete.

131.    In a statement issued by her attorney, Watson later supplemented her initial allegation by claiming that Fairfax used the alleged rape by the Duke Athlete against her and allegedly stated the following in a conversation during an unspecified campus party at Duke in 2000:

> [Watson] left a campus party when [Fairfax] arrived, and he followed her out. She turned and asked: "Why did you do it?" Mr. Fairfax answered: "I knew that because of what happened to you last year, you'd be too afraid to say anything."

132.    Watson's statements in February 2019 contained several falsehoods, all of which were intentionally fabricated. At a minimum:

   a.  Watson and Fairfax's sexual encounter in the spring of 2000 was completely consensual. Her statements to the contrary—including that she "was raped by Justin Fairfax," that his "attack was premeditated and aggressive," and that "Mr. Fairfax raped at least one other woman after he attacked her"—are false.

   b.  There was an eyewitness – Dhamian Blue – in the room (which was *his* dorm room) during the entire encounter. Watson lied by omission in telling a narrative in which only she and Fairfax were present.

   c.  The alleged conversation outside of an alleged, yet unspecified, campus party at Duke in 2000 never occurred. Her statements recounting this alleged

53

conversation and implying that Fairfax admitted to raping and sexually assaulting her are false.

133.    Watson, too, has called for hearings in the Virginia General Assembly. She has not called for any criminal investigation and has resisted all efforts to have an independent law enforcement investigation into her allegations against either Fairfax or the Duke Athlete.

134.    On June 13, 2019, Watson's lawyer, Nancy Erika Smith, repeatedly and personally accused Fairfax of raping Watson without stating the basis on which Smith was asserting factual information about Fairfax given that she had no personal knowledge on which to base her assertions. Smith went on to state that Watson had "told others about the rape," that there was no time between "Fairfax's rape of Ms. Meredith Watson" and her telling others, and that Watson had sent an email that "revealed the rape."

### *A CBS Lawyer with Responsibility for Defamation Litigation at the Network Has Knowledge that There is Evidence that the Watson Allegations Aired by CBS Were False*

135.    Since 2010, CBS has employed as its associate general counsel a mutual friend of Watson, Fairfax and the eyewitness (the "AGC").

136.    At CBS, the AGC focuses on litigation matters, including defamation.

137.    The AGC is a 1999 graduate of Duke University. He is also a fraternity brother of Fairfax and of the eyewitness to the encounter between Fairfax and Watson.

138.    The AGC dated Watson during the 1998-1999 academic year.

139.    During the 1998-1999 academic year, the AGC also lived in the same fraternity house dorm room that the eyewitness later lived in during the 1999-2000 academic year.

140.    Upon information and belief, Watson visited that fraternity house dorm room numerous times during both academic years.

141.     The AGC learned about Fairfax's and Watson's consensual sexual encounter after it occurred though the AGC was not present during the encounter.

142.     The AGC remains friends with Fairfax and the eyewitness.

143.     Fairfax and the AGC exchanged numerous text messages and had several conversations since Watson went public with her false accusation against Fairfax in February 2019. Most of these communications occurred ***before*** the April 2019 interviews were aired by the AGC's employer and client, CBS.

144.     In all their conversations, Fairfax and the AGC knew from both Fairfax and the eyewitness that the eyewitness was in the room throughout the encounter and that the encounter between Fairfax and Watson was completely consensual.

145.     Since February 2019, the AGC has discussed the allegations with Fairfax, the eyewitness and other individuals.

146.     On February 8, 2019, the day the Watson story broke, Ed O'Keefe, a CBS News Political Correspondent, was in contact with Fairfax's spokesperson. She sent him a list of names and phone numbers, saying, "Please Ed call these Duke grads." She also admonished him, "Please [d]o reporting and **don't rush it**." (sic) In his response, O'Keefe noted that among the people on the list provided by Fairfax was "an attorney for CBS." He also stated that the individuals on the list were not answering his calls.

147.     CBS widely promoted its interview of Watson before it aired on April 2, 2019.

148.     Upon information and belief, either the AGC was unable to prevent CBS from airing the Watson interview, or the AGC did not take steps to prevent CBS from airing the

Watson interview, despite this knowledge from the eyewitness and from Fairfax that Watson's story was false and that there was an eyewitness corroborating that Watson's story was false.

149.    The AGC is not a low-level employee of CBS with a minimal role in the organization. He is a lawyer for CBS who has specialized knowledge of defamation law and the expertise to understand the importance of reporting truthful stories and the legal liability CBS could face if it aired a demonstrably false interview. Any reasonable journalistic investigation by CBS would have established that an AGC at CBS attended Duke at the same time as Watson and Fairfax. From there, CBS would have been able to establish that Watson had a relationship with the AGC, that the AGC knew the accused and was aware of a witness that refuted Watson's allegations. It is beyond any reasonable belief that an explosive allegation being prepared within CBS and promoted aggressively on CBS that an elected public official committed a rape would not attract the attention of every lawyer in the CBS General Counsel's office.

150.    The Watson interview aired nearly two months after Fairfax urged CBS to contact the AGC. It is not known if O'Keefe, or anyone else from the team of people at CBS who worked on the Watson interview contacted the AGC, but certainly they had the ability to do so as well as actual notice that the AGC had pertinent information related to Watson's allegation against Fairfax. The fact that it was Fairfax's spokesperson who was forwarding this information on the very first day that this story broke on February 8 meant that Fairfax's team was providing it to either contradict Watson's story or support Fairfax's denial of the accusations. Otherwise, it would make no sense for Fairfax's team to share contact information for these individuals and urge CBS to contact them before running the story.

151. To have ignored, disregarded, or minimized this critical information before broadcasting Watson's sensational, fabricated and defamatory story to millions of viewers nationwide is yet another stunning example of CBS' reckless disregard for the truth.

**NYPR and Perry Publish Defamatory Statements by Tyson and Watson on The Takeaway with Knowledge that There is Evidence that those Statements Are False and/or with a Reckless Disregard for Their Truth**

152. On or about August 6, 2021, NYPR and Perry maliciously published through their broadcast, digital, social media and other media platforms an interview of Tyson (featuring audio of statements previously made by Watson during an April 2, 2019, interview on CBS This Morning with Gayle King) on the NYPR/WNYC news program called "The Takeaway." The interview was conducted by Perry who was then the "Interim Host" of the program.[18]

153. In that interview – which was ominously titled "Politics, Power, and Abuse", Tyson makes highly defamatory *per se*, false and damaging express and implied statements and allegations that, among other things, Mr. Fairfax "assaulted," "sexually assaulted," "abused," and/or "raped" her in July 2004 in a hotel room in Boston, MA during the 2004 Democratic National Convention and that he has "intimidated" her and "abused" his power.

154. Specifically, Tyson made the following defamatory statements (both explicitly and by implication) with "actual malice" during The Broadcast:

---

[18]  According to Perry, in October 2021, she became the "Permanent Host" and "Managing Editor" of The Takeaway. According to public statements by NYPR and Perry, The Takeaway is broadcast online and via podcast to a worldwide audience and to 300 public radio stations across the United States of America, including at least four stations located in Virginia (WLUR – Lexington, VA, 91.5 FM; WVRU – Radford, VA, 89.9 FM; WVFT Radio IQ – Richmond, VA, 92.5 FM; and WVFT Radio IQ – Richmond, VA, 103.7).

A. Melissa Harris-Perry: As pressure mounted, it seemed that Northam was out and that he would be replaced by the young African-American Lieutenant Governor, Justin Fairfax. It wasn't that context when the nation met someone I have known for decades.

Participant: Vanessa Tyson is her name. She says that Lieutenant Governor, Justin Fairfax assaulted her in 2004. Now he categorically denies these allegations.

B. **Melissa Harris-Perry:** Vanessa Tyson is a professor of political science at Scripps College in Southern California. I first met Vanessa more than 20 years ago. Having graduated from Princeton University with an award-winning senior thesis, she came to the University of Chicago to earn a PhD. in political science. I just began working as an assistant professor in the department at UChicago.

Vanessa's keen intellect, generosity of spirit, and deep commitment to racial and gender justice were readily apparent. This week, she sat down with me here on *The Takeaway* to discuss the news about Governor Andrew Cuomo, and to reflect of her own very public journey over the past several years. I asked how she felt when she first learned about the New York Attorney General's report detailing Governor Cuomo's pattern of sexually harassing women with whom he worked.

**Vanessa Tyson: "**I wish I could say I was surprised, but the reality is that I'm not.

The abuse of power tends to be rampant in our society, particularly political power, but we see abuses across every industry, within families, within communities, and so on. No, I'm not surprised."

C. **Vanessa Tyson: "**Some of my friends in Virginia had told me that it was very likely that Governor Ralph Northam was going to step down, and that my rapist was going to get a promotion. I remember I was actually at a conference and I was in a hotel room, and it was a Saturday morning and I was crying in the shower, just sobbing in the shower because it seemed so unfair. I had tried to come forward before Lieutenant Governor, Justin Fairfax was sworn in, but that didn't stop anything. Now it looked like he was going to become governor and I was just horrified."

D. **Vanessa Tyson: "**What's interesting is that I actually tried to come forward in 2017 and this is fairly well-documented in December of 2017, before Justin Fairfax became Lieutenant Governor of Virginia, but had already been elected. I spoke with *The Washington Post* on multiple, multiple occasions about what had happened between him and myself in a hotel room, in Boston during the Democratic Convention Party Convention, the DNC of 2004. I did my best to explain to them what happened. For three and a half months we went back and forth and then *The Washington Post* decided to can the storage for lack of a better term."

E. **Vanessa Tyson: "**I'm disappointed but I've been following politics since I was at least three years old. The reality is I've had a lifelong of disappointment. What I would say is that politicians, regardless of whatever party they belong to seek power and seek to maintain power. When the Democratic Legislators of Virginia opted not to engage in hearings, opted not to allow me and other women who had suffered abuse at the hands of Justin Fairfax, it showed where their priorities were and it was extremely disappointing. It's disappointing now. Again, I'm not surprised. I wish I were."

F. **Vanessa Tyson**: "Well, I think if I marinated in that one for too long, I would be deeply, deeply depressed. Instead, I try to focus on what I can do to help because no matter what I've been through, there's always someone else who has had it worse. There's always going to be more women who have been victims of abuse, more women and men who've been victims of various forms of emotional, physical, and sexual abuse, including sexual harassment in the workplace.

What I think about and what I try to focus on, and I think this has been a common trend amongst African-American women is that we have a bunch of people that we need to help, it's not just about us, we are connected, there is sisterhood. In that sisterhood, it means that we don't necessarily always stand for ourselves, it's that we're standing for all of us. I think about the Democratic Party and at times, I certainly believe that the Democratic Party takes Black women for granted. I think that's a rather common phenomenon.

What I will say, however, is that, as a Black woman, I am not going to let my fellow sisters down, I am not going to let all of the Black women and men who have been abused throughout their lifetimes in whatever way, I'm not going to allow them to be let down. Despite the shortcomings, if you will, of the Democratic Party, as an institution, I think it's important that I, as an individual, stay involved and engaged in the Democratic Party, but also, make sure that I stay true and authentic to who I am, and stay true to the people who have been through so much pain, and so much exploitation, so that they know that they're not alone.

I don't see it as a choice as much as I see my activism and advocacy and even my willingness to come forward under rather terrifying circumstances, as a means to set an example and to try to help others know that they're not alone."

G. **Vanessa Tyson: "**What I would say is that Black women throughout the history of this country have always been collateral. I would add to that, Black children and Black men. As a consequence, what happens is that we're put in this weird situation of trying to survive amid this palpable oppression."

H. **Vanessa Tyson: "**It seems like we're only recently talking about systemic racism. It's coming up and of course, there's plenty of backlash, and so on and so forth but what I want to think about is systemic abuse, and how powerful people either not only abuse

others, and use their power as a means to abuse others, use their power as a means to further frighten and intimidate those that they've abused, which I've personally been the recipient of.

I also want to think about how our systems and structures allow for abuse to continue and perpetuate, and really, what does it take for institutions to have the actual courage to reflect upon how they contribute to abuse that very much shapes and hurts members of our society."

155.    Each of these express and implied statements is false and defamatory and each was made with knowledge that they were false and/or with a reckless disregard for whether they were false ("actual malice"). Perry and NYPR published, repeated and adopted these statements with knowledge of their falsity and/or with a reckless disregard for their truth.

156.    In that same interview, NYPR maliciously published and re-published defamatory *per se* statements originally made with "actual malice" by Watson of and concerning Fairfax in an interview on CBS This Morning with Gayle King that originally aired on April 2, 2019.

157.    In her full original interview, Watson falsely claimed that Fairfax locked her in a fraternity dorm room, blocked the doorway to prevent her exit, turned out the lights in the room, moved her from a couch to a bed, repeatedly pushed her down, and raped and sexually assaulted her in the spring of 2000 when both were undergraduate students on campus at Duke University.

158.    On August 6, 2021, Perry and NYPR aired the following audio clip on The Takeaway (featuring defamatory *per se* statements by Watson and Perry):

**Melissa Harris-Perry**: According to The Washington Post, 'The Post did not run a story at the time because it could not corroborate Tyson's account or find similar complaints of sexual misconduct.' This time, in 2019, there was another account of Fairfax as an abuser. Meredith Watson, a classmate of Mr. Fairfax, publicly alleged that the Lieutenant Governor sexually assaulted her in 2000 when they were both college students at Duke University.

**Meredith Watson**: "He [Justin Fairfax] did things that you shouldn't do to someone without their permission. I tried several times to get up and leave and was pushed back down."

159.    Watson's allegations are brazen and demonstrably false fabrications. In her interview originally published by CBS on April 2, 2019, Watson intentionally failed to disclose that she and Fairfax were never in a room alone together when she claims the rape and sexual assault occurred or the fact that there was an exonerating eyewitness – Mr. Dhamian Blue – present in *his* dorm room during the entirety of the consensual encounter who has stated definitively to numerous people that Fairfax did not rape or sexually assault Watson in any way.

160.    On information and belief, NYPR did not do any independent investigation of the actual facts before publishing and re-publishing Watson's false and previously debunked statements and story, even though substantial evidence had been made publicly available in the

63

over two years since that interview that called the truth of Watson's allegations and credibility

into question. NYPR apparently did not speak to Watson, her attorney Nancy Erika Smith, Mr.

Blue (the exonerating eyewitness) or to anyone who knew Watson in the year 2000 who might

have knowledge relevant to determining the falsity of her current claims about Lt. Governor

Fairfax.[19]

161.    Watson first made her allegations publicly through her attorney and a professional

public relations firm on February 8, 2019.[20]  Since then, Mr. Blue (the eyewitness) has stated

definitively to multiple people that, at the time, Mr. Fairfax did not live in the dormitory

identified by Watson as the site of the alleged assault, Watson initiated the encounter with

Fairfax in Blue's room in his presence, that she unambiguously manifested her consent

throughout the entire encounter, that she remained with Blue in his room after Fairfax left

(Watson falsely stated in her interview with Gayle King that she left immediately after the

encounter with Fairfax "to get to a safe space") without making any claims that the encounter

with Fairfax was non-consensual, and that Fairfax unequivocally did not rape or sexually assault

Watson.

---

[19]    Watson also has alleged that she was raped a year earlier by former Duke Basketball player Corey Maggette when they were both students at Duke University – an allegation he has consistently and adamantly denied. Watson repeatedly has refused to seek law enforcement investigations into either of the two rapes she alleges she suffered at Duke University thus assuring that no investigation of her allegations by unbiased, professional investigators will be conducted.

[20]    Watson and Tyson both originally made their false allegations during the week that Lt. Governor Fairfax appeared poised to be elevated to the governorship of Virginia in the wake of a racist photo scandal involving the Governor that first erupted on February 1, 2019. Tyson's allegations were made public on February 3, 2019, and Watson's were made public on February 8, 2019. Had Mr. Fairfax become Governor at that time, he would have been the only African-American serving as Governor in the entire United States of America at the time.

162.    At no point before, during or after the August 6, 2021, broadcast of The Takeaway did Perry or NYPR ever mention that a third-party exonerating eyewitness was present during the 2000 encounter at Duke University between Mr. Fairfax and Watson, even though that information had been widely-reported at least as early as July 9, 2019.

163.    That glaring omission, among many others, clearly demonstrates that Perry and NYPR published (and re-published) the defamatory allegations of Watson with knowledge of their falsity and/or with a reckless disregard for their truth ("actual malice"). The failure of Perry and NYPR to report this critical exonerating information to their national audience is absolutely stunning, reckless and unconscionable for several reasons.

164.    **First**, the information was publicly-known and had been widely-reported in the media for more than two (2) years prior to the August 6, 2021, broadcast of The Takeaway. On July 9, 2019, Mr. Fairfax's attorney Barry Pollack sent a letter to Durham, NC District Attorney Satana Deberry revealing the existence of an exonerating eyewitness to the consensual encounter between Fairfax and Watson in 2000 at Duke University. That information was widely-reported beginning on July 10, 2019, by major national media outlets, including The Washington Post, The Associated Press, The New York Times, CNN and numerous others.

165.    **Second**, on December 6, 2019, legal counsel for CBS – which was then a defendant in a highly-publicized federal defamation suit filed by Mr. Fairfax in the U.S. District Court for the Eastern District of Virginia based on the network's April 1 and 2, 2019 defamatory interviews of Tyson and Watson – conceded to the Court during a hearing on the Motion to Dismiss that it would constitute a "plausible allegation of actual malice" if CBS had had prior

knowledge of the exonerating eyewitness involving the encounter between Fairfax and Watson and failed to inquire about or report on that fact in its broadcasts.

166.    As Mr. Lee Levine of Ballard Spahr LLP stated to the Court on behalf of his client CBS during that hearing, "In any event, Your Honor, I will concede to you that if Fairfax's spokesperson had said, I am going to give you the name and telephone number of somebody who was an eyewitness to one of these alleged sexual assaults, who was there the entire time and will tell you that it didn't happen, if CBS didn't follow up on that, that's probably a plausible allegation of actual malice, but that's not what happened here. They just gave [CBS] a name, and at all relevant times, could have said what I just said but didn't, willfully concealed that information."

167.    **Third**, in its June 23, 2021, published opinion regarding Fairfax's appeal, the U.S. Court of Appeals for the Fourth Circuit ruled that there was no "actual malice" on the part of CBS because there was no allegation that CBS "had any reason, at the time of the alleged defamatory statements, to believe that an eyewitness existed or to understand the significance of asking whether Watson saw anyone else that evening."

168.    The Court went on to write, "This is not a case like *Harte-Hanks*, where journalists failed to make any effort to interview a known key witness to the event that was the subject of the report. See 491 U.S. at 682, 692. To the contrary, Fairfax has alleged that he revealed the existence of an eyewitness for the first time after the CBS broadcast. We cannot infer any bad faith on the part of CBS for failing to more vigorously pursue a third party for information when, at the time of the broadcast, it had no reason to believe that third party witnessed the relevant event."

66

169.    In stark contrast, Perry, NYPR and even Tyson (and the attorneys for Tyson and Watson, Debra Katz and Nancy Erika Smith) were *absolutely aware* of the existence of the exonerating eyewitness, who had first been disclosed and widely-reported on in July 2019 and named publicly at least as early as February 2020. Thus, the existence of the exonerating eyewitness had been widely-reported for more than two years prior to the August 6, 2021, broadcast of The Takeaway. The failure by NYPR and Perry to inquire about or report on that crucial information – that went directly to Mr. Fairfax's innocence – clearly establishes "actual malice" according to well-established Fourth Circuit and U.S. Supreme Court precedent.

170.    **Fourth**, on July 24, 2020, The Washington Post – which is cited numerous times by both Perry and Tyson during the August 6, 2021 The Takeaway Broadcast – published an editorial by its Editorial Board reviewing the facts and circumstances surrounding the allegations by both Tyson and Watson, detailing Fairfax's efforts to prove his innocence – including taking multiple lie detector tests, repeatedly calling for law enforcement investigations and filing a federal defamation lawsuit against CBS – calling the truth of those allegations into question and even asking whether Fairfax was "a victim of false accusations and a rush to judgment."

171.    In that editorial, The Post also stated that Fairfax had "raised some questions and pointed out some inconsistencies in the accounts of the women [Tyson and Watson] that need to be addressed. Most notable is his assertion that there was a witness to the Duke incident who will corroborate his claim that the sex was consensual. Watson's attorney, Nancy Erika Smith, has pointedly refused to answer the question – which we posed again – of whether a third person was present. Aside from her sympathetic questioning by CBS's Gayle King, Watson has not been available for interviews. Shouldn't authorities in North Carolina, where there is no statute of

limitations on rape, look into this matter, particularly because Watson claims to have been victim of a separate rape one year earlier at Duke by a prominent basketball player?"

172.    Without reporting any of this critical information that seriously called into question the truth of the allegations and stories of Tyson and Watson, NYPR and Perry published these salacious, false, fabricated and defamatory allegations, causing ongoing permanent and nearly incalculable harm and damage to Mr. Fairfax's reputation, family, livelihood, future earnings potential, and professional and political careers.

173.    In her interview on CBS This Morning with King, Watson was never asked to specify the location of the room in which the alleged assault took place, the name of the person who resided there, the date or time of the alleged assault, or whether she encountered any witnesses in the dormitory immediately before, during, or after the time of the alleged assault who could corroborate (or disprove) her story. Tellingly, unlike Fairfax, Watson has refused to take a lie detector test and has refused to request or participate in any law enforcement investigation or file a criminal complaint regarding these allegations under oath and penalty of perjury.

174.    By contrast, Fairfax has repeatedly called for a criminal investigation into Watson's allegations and has gone so far as to repeatedly and publicly contact the District Attorney's Office in Durham, North Carolina to request that it launch a criminal investigation and, more recently, voluntarily interview with the FBI for three hours with no lawyer present to establish the facts and his innocence.

175.    In her full interview broadcast by CBS, Watson also made the false, preposterous, and defamatory claim that she had a conversation with Mr. Fairfax sometime in 2000 after the

alleged assault in which Fairfax supposedly admitted that he had assaulted Watson because he knew he could "get away with it" since she said she previously had been sexually assaulted by a Duke basketball player and "would be too afraid" to report a subsequent assault. Watson fabricated this conversation from whole cloth and offers absolutely no proof or corroboration to support that this fictitious conversation or interaction ever happened. Furthermore, as confirmed by the results of Fairfax's successful polygraph examination concerning Watson's allegations, no such conversation ever occurred. It does not appear that NYPR or Perry did anything to corroborate the veracity of Watson's story before publishing and re-publishing highly defamatory and damaging statements that she made therein.

176.   Even more inflammatory, Watson cynically claimed in her interview with King that the #MeToo Movement had given her the "courage" to come forward with her allegations against Fairfax and that she was sharing her story to support the allegations of sexual assault made by Tyson. In light of the now publicly-released evidence that Watson fabricated her allegations of rape and sexual assault against Fairfax and purposefully hid the fact that there was a third-party exonerating witness present in the room – his own dorm room – throughout the encounter who could disprove her allegations, it is deeply disturbing, sad, and cynical that NYPR and Perry would continue to publish and re-publish these false allegations and serve to undermine the worthy goals of a movement meant to ensure that actual survivors of sexual assault have the opportunity to be heard and seek justice. False and fabricated allegations like those of Watson and Tyson aired and promoted by NYPR with knowledge of their falsity and/or reckless disregard for their truth severely undermine the #MeToo Movement by giving fodder to those who fail to take legitimate allegations seriously.

177.    Additionally, NYPR and Perry demonstrated "actual malice" and underscored the defamatory meaning of the false statements made by Tyson and Watson during the August 6, 2021, Broadcast in numerous ways, including, but not limited to, the following:

178.    **First**, NYPR and Perry failed to include in The Broadcast any of the substantial amount of information pointing to Fairfax's innocence and extraordinary efforts to clear his name (e.g., voluntarily taking, passing and releasing the results of two separate lie detector tests administered by the same former FBI Agent previously hired by Tyson's lawyer, Debra Katz, to examine her client Christine Blasey-Ford; repeatedly calling for law enforcement investigations by the FBI and District Attorneys in Durham, NC and Boston, MA, agreeing to participate in a legislative hearing in the Virginia General Assembly if a criminal investigation was conducted first; and filing a federal defamation lawsuit against CBS for its April 1 and 2, 2019 airing of defamatory interviews of Tyson and Watson).

179.    **Second**, NYPR and Perry failed to ask Tyson or Watson *any* investigative questions to explore any inconsistencies or test their credibility or the veracity of their allegations and stories about Fairfax. For example, Tyson had definitively stated in her February 6, 2019, lawyer-issued statement that she met Fairfax "on July 26, 2004" during "the first day of the convention" in Boston, MA. However, prior to Tyson's August 6, 2021, interview with Perry, it had been established, and widely-reported, that Fairfax was not in Boston on that date – but rather was in Raleigh, NC – and that Tyson either fabricated her statement or had a provably false memory. Unlike the Courts' description of the 2019 interviews conducted by CBS, Perry shockingly did *nothing* to probe the account of the accusers to determine whether they were true or false.

180.    **Third**, NYPR and Perry failed to reach out to Fairfax in a reasonable amount of time prior to The Broadcast or to include his publicly available statement or version of events in The Broadcast. Counsel for NYPR has represented that a member of the WNYC editorial team reached out to Fairfax's office on August 5, 2021 – *only one day before* NYPR and Perry aired their highly-produced and severely defamatory Broadcast to the station's large national and international audience. Whether or not they heard back – or had given Fairfax a reasonable enough amount of time to respond to this new, surprise broadcast in less than one day during a week that Lieutenant Governor Fairfax was in Special Session fulfilling his constitutional responsibility to preside over the Senate of Virginia – NYPR and Perry already had access to lengthy and detailed public statements responding to the allegations of Tyson and Watson, including at the time of the April 1 and 2, 2019 CBS This Morning interviews with Gayle King, which – as the Courts have noted in finding no "actual malice" against the network – were read on-air by CBS and placed on their website. Perry and NYPR could simply have read and posted the same public statements if they were interested in presenting a fair and balanced report of the same uncorroborated allegations being leveled once again on The Broadcast against Fairfax by Tyson and Watson. However, the goal was not to produce and publish a fair and balanced report. The goal was to produce an astonishingly biased and defamatory piece against Fairfax led by Tyson and her longtime personal friend, teacher and political supporter Perry. And, that goal was very successfully achieved.

181.    **Fourth**, Perry violated basic journalistic standards and demonstrated extraordinary bias in favor of her longtime friend, former student and colleague – whom she had

supported financially and otherwise during Tyson's political run a seat in the California State Assembly announced in December 2019.

182.    In addition to what was displayed during The Broadcast, Perry has repeatedly demonstrated her bias in her voluminous social media posts and elsewhere – adopting Tyson's statements as true, presenting them as fact (both expressly and in context) and casting aspersions on Fairfax without any corroborating evidence that he had committed any crime. In fact, the August 6, 2021 "Politics, Power, and Abuse" broadcast was itself clearly just an opportunity for Perry to platform the false allegations of Tyson and Watson against then-Lieutenant Governor Fairfax and to continue the smear campaign against him, even after (as Perry gloats on the broadcast) he had lost the primary for Virginia Governor due in large part to the false allegations leveled against him by Tyson and Watson. Perry was clearly acting as a friend and an advocate, not as an unbiased journalist presenting a fair and balanced report regarding very serious and unproven accusations.

183.    For example, Perry authored the following relevant tweets on her twitter handle/account @MHarrisPerry over the past several years, starting on the very first day Tyson's February 6, 2019, lawyer-issued statement was issued:



**Melissa Harris-Perry** ✔
@MHarrisPerry

I know Vanessa. I taught Vanessa when she was a student  #IBelieveVanessa

7:16 AM · 2/6/19 · Twitter for iPhone

**64** Retweets  **7** Quote Tweets  **272** Likes



**Melissa Harris-Perry** ✔
@MHarrisPerry

I finally had the opportunity to talk with my friend and colleague, Vanessa Tyson, about her courageous choice to stand against the abuse of  politics and power. Here's our conversation on @TheTakeaway wnycstudios.org/story/politics…

1:43 PM · 8/6/21 from North Carolina, USA · Twitter for iPhone



**Melissa Harris-Perry** ✔
@MHarrisPerry

· · ·

The first person I texted when I read
the Cuomo report was
@VanessaCTyson. I'm so grateful she
agreed to join me on @TheTakeaway to
discuss Politics, Power, and Abuse
wnycstudios.org/story/politics...

5:26 PM · 8/6/21 from Boiling Spring Lakes, NC ·
Twitter for iPhone



**Melissa Harris-Perry** ✔
@MHarrisPerry

"I was disappointed. But I've been paying attention to politics since I was 3. So I've had a lifetime of disappointment" — @VanessaCTyson articulated what many of us feel about the abuse of politics and power on @TheTakeaway wnycstudios.org/story/politics…

5:30 PM · 8/6/21 · Twitter for iPhone



**Melissa Harris-Perry** ✔
@MHarrisPerry

If you still haven't had time to listen to @VanessaCTyson as she discusses politics, power, and abuse, bookmark the link to @TheTakeaway podcast and carve out a little time to hear her powerful testimony and analysis. wnycstudios.org/story/politics…

9:39 AM · 8/10/21 · Twitter Web App

 **Melissa Harris-Perry** ✔
@MHarrisPerry

Thrilled beyond measure to support @VanessaCTyson in her California assembly race.



secure.actblue.com
I just donated to Vanessa!

12:17 PM · 12/27/19 · Twitter for iPhone

78



**Melissa Harris-Perry** ✓
@MHarrisPerry

···

In the final hours of 2019 can you take a stand for fairness, for brilliance, for democracy and give to the crucial California State House campaign of @VanessaCTyson? I'm making a contribution to @Vanessa4CA as my final political act of this decade.



secure.actblue.com
I just donated to Vanessa!

9:28 PM · 12/31/19 · Twitter for iPhone

 **Melissa Harris-Perry** ✔ @M... · 12/31/19   ...

In the final hours of 2019 can you take a stand for fairness, for brilliance, for democracy and give to the crucial California State House campaign of @VanessaCTyson? I'm making a contribution to @Vanessa4CA as my final political act of this decade.



secure.actblue.com
I just donated to Vanessa!

💬 2          ⟲ 17          ♡ 56          ⬆️

 **Vanessa for Assembly** @Van... · 12/31/19   ...

MHP, you are the best! Thank you.

💬 1          ⟲          ♡ 3          ⬆️

 **Melissa Harris-Perry** ✔
@MHarrisPerry                                    ...

Replying to @Vanessa4CA and @VanessaCTyson

Let's do this!

9:38 PM · 12/31/19 · Twitter for iPhone

184.    **Fifth**, NYPR and Perry demonstrated "actual malice" and underscored the defamatory meaning of the false statements made by Tyson and Watson during the August 6, 2021, Broadcast by violating NYPR's own Values & Mission Statement ("The Statement"). The Statement, which is posted on WNYC's website, calls for NYPR "to make the mind more curious," to "create impact – deeper understanding, richer conversation and more engaged and enlightened communities" in large part "through independent journalism, telling stories that matter, leading courageous conversations." The Statement also calls for NYPR to "listen with curiosity and empathy to each other" and every day to "challenge ourselves to be better."

185.    Crucially, the Statement also requires NYPR and its programs to **"explore and explain the why – with our colleagues and with our audience,"** to **"build trust through positive collaboration"** ("We believe that we can be better together. We support each other, participate in good faith and deliver honest feedback. We invest in each other's success."

186.    Additionally, the Statement calls on NYPR to "be accountable, expect excellence and celebrate." ("We strive to do the right thing. We are accountable to each other, to the New York Public Radio as a whole and to our community of listeners. We expect excellence and have fun celebrating success, learnings and insights.")

187.    With its extraordinarily biased and purposefully misleading and defamatory Broadcast of "Politics, Power, and Abuse" targeted continuing to platform the years long smear campaign against Fairfax, NYPR and Perry failed every test of its own Values and Mission Statement:



# NYPR Values & Mission

  

## Mission: To make the mind more curious, the heart more open and the spirit more joyful through excellent audio programming that is deeply rooted in New York.

Through independent journalism, telling stories that matter, leading courageous conversations and celebrating the power of music, we create impact – deeper understanding, richer conversation and more engaged and enlightened communities.

**We live our values on air and off air.**



## Listen deeply and embrace all voices

Listening is our core strength. We listen with curiosity and empathy to each other, to our city, our audiences and our work.

## Embrace equity

We believe in equity and inclusion in the stories we tell and in the ways we treat each other. We invest in our people and help them chart their way. We have courageous conversations.

## Push the boundaries of what is possible

Creativity is a hallmark of our work and our service. Through bold moves as well as continuous improvements, we push the boundaries to drive impact. Every day, we challenge ourselves to be better.



### Explain the why

We explore and explain the why – with our colleagues and with our audience.

### Build trust through positive collaboration

We believe that we can be better together. We support each other, participate in good faith and deliver honest feedback. We invest in each other's success.

### Be accountable, expect excellence and celebrate

We strive to do the right thing. We are accountable to each other, to New York Public Radio as a whole and to our community of listeners. We expect excellence and have fun celebrating success, learnings and insights.



Listener-supported WNYC is the home for independent journalism and courageous conversation on air and online. Broadcasting live from New York City on 93.9 FM and AM 820 and available online and on the go.

***CBS This Morning Acted with Actual Malice When It Aired Watson's and Tyson's***

***Defamatory Interviews to Improve Its Own Public Image in Light of Recent High-***

***Profile #MeToo Scandals***

188.    Since the #MeToo movement began in 2017, CBS has had one embarrassing workplace sexual misconduct scandal after another, including many women alleging sexual assault or harassment against one of *CBS This Morning's* former main anchors, Charlie Rose. This pattern culminated with the firing of CBS' CEO Les Moonves in December 2018.

189.    In light of its need to improve its public image and put these incidents in its rearview mirror by currying favor as a preferred media outlet for airing accusations against public figures, the network sought to visibly align itself with alleged victims of sexual misconduct and, therefore, had a strong incentive to hype and air the false allegations by Watson and Tyson against Fairfax. The extensive promotion of the Watson and Tyson interviews before they were aired serve as clear evidence of CBS' intent to establish its #MeToo bona fides and to derive corporate profits at Fairfax's expense.

190.    Upon information and belief, *CBS This Morning* decided to interview Tyson and Watson sometime in March 2019.

191.    CBS was the only major network to air interviews with Tyson and Watson. Co-Host Gayle King introduced on-air interview segments of Tyson and Watson by first stating, "Only on *CBS This Morning*…." These were their first television interviews since each made their allegations public in February.

192.    Their interviews were taped in late March with King and aired on April 1 (Tyson) and April 2 (Watson).

85

193.    CBS did not alert Fairfax that it was conducting the interviews of Watson and Tyson in late March. Fairfax's staff only learned about the taping of the interviews through sources outside of CBS.

194.    CBS heavily promoted the interviews of Tyson and Watson on their broadcast, social media, and other platforms in the days leading up to the interviews' airing on April 1 and 2, respectively—the two days preceding the one-day April 3 reconvened session of the Virginia General Assembly during which Fairfax would publicly preside over the Senate as Lieutenant Governor.

195.    The *CBS This Morning* team that worked on these interviews included Co-host King, Correspondent Ed O'Keefe, and Producers Kaci Sokoloff and Adam Verdugo. Upon information and belief, other individuals within CBS were involved in publishing the Watson and Tyson interviews.

### *CBS Acted with Actual Malice by Taking Steps to Ensure that the Aired Interviews Met Defendants' Preconceived Narrative that Fairfax Had Assaulted Tyson and Watson*

196.    Upon information and belief, the CBS team had a preconceived narrative of the story it wanted to tell with respect to these allegations: that Fairfax had sexually assaulted Tyson and Watson. Also, upon information and belief, the CBS team took steps to ensure that the interviews that were aired fit that preconceived narrative in several ways.

197.    First, King failed to ask basic questions of Watson and Tyson that would establish the actual facts of the encounters.

198.    Second, the CBS team failed to separately investigate the allegations in advance of the airing date, and instead only spoke to Watson, Tyson and their representatives. For

example, upon information and belief, CBS failed to interview other individuals who may have been able to confirm or contradict the allegations.

199.    Third, CBS ensured that the final, aired stories fit its preconceived narrative by conducting an unusual "pre-interview" of Watson, and perhaps of Tyson as well. This pre-interview gave Watson an advance view of what questions would be asked so that she could prepare her answers and avoid being surprised by questions for which she did not have the answer or which her answers would not fit CBS' preconceived narrative.

200.    Fourth, the final interviews aired by CBS are edited and there are several breaks in the questioning. It is not yet known if the editing process used by CBS was also part of its effort to ensure that the final interviews fit CBS' preconceived narrative that Watson's and Tyson's claims were truthful.

201.    CBS promised Fairfax's spokesperson that CBS "will continue to report on both sides" and that it would "continue to get both sides of the story out." Yet, CBS conspicuously broke that promise by not reporting on both sides of the story when it failed to update the interviews, including with the new information from July 2019 about the exculpatory eyewitness to Watson's encounter with Fairfax.

202.    CBS' state of mind is also evidenced by its communications with Fairfax's counsel following a demand letter to retract the stories after the July 9 revelation that there was an exculpatory eyewitness who knew Watson's allegation to be false. CBS defensively said that Fairfax's demand that CBS retract the interviews was a request to "brand Ms. Watson as a liar." CBS also stated that Fairfax's demand to CBS to retract the interviews was "an attempt to strong arm CBS and to intimidate Ms. Watson and, possibly, Tyson as well, into silence." First,

Fairfax's request was merely for CBS to take its objective reporting role seriously and determine the basic facts underlying Watson's and Tyson's claims to ascertain whether their allegations were true or false. If there was information and reporting available that an exculpatory eyewitness was present during the encounter and that Watson did not mention that eyewitness in her story, then CBS has an obligation to report that information, as many other major news outlets already have. CBS' role is to objectively report facts and not to defend the credibility of either the accuser or the accused. Second, CBS is well aware that Watson and Tyson have not been "silenced," nor could they be, since the network aired their interviews to a national audience of millions of people and profited off those interviews.

203.    There is further evidence that CBS intentionally and improperly took the accusers' side not only in believing the allegations by Tyson and Watson, but also by publicly asserting that the allegations *alone* were sufficient grounds for Fairfax to resign his office as Lieutenant Governor of Virginia.

204.    On April 3, 2019, Fairfax spoke at a press conference in Richmond in which he (a) publicly released to the media the results of his voluntary polygraph test examinations refuting the allegations, (b) informed the media that his attorney had contacted the District Attorneys in both Boston, Massachusetts, and Durham, North Carolina, at Fairfax's direction to request that they initiate investigations into the allegations by Tyson and Watson and pledged his full cooperation with any such investigations, and (c) again specifically refuted key factual allegations made by Tyson and Watson bearing on their credibility and declared his innocence and intention to continue to take measures to prove that innocence.

205.    Upon information and belief, neither Tyson nor Watson has taken a polygraph test and released those results to the public to support the veracity of their allegations.

206.    Upon information and belief, neither Tyson nor Watson has formally requested a criminal investigation into their allegations by the District Attorneys in Boston or Durham.

207.    Even with that knowledge, CBS Correspondent Jeff Pegues shouted out to Fairfax at the conclusion of the April 3 press conference, "These allegations are not going away. At what point do you just resign?"

208.    This unprompted question is further evidence that CBS (a) was unconcerned about determining whether the allegations were true or false and (b) believed that Fairfax should resign merely because the allegations had been made.

209.    CBS' actions, taken together, demonstrate reckless disregard for the truth of the allegations, a corporate determination to demonstrate the network's #MeToo bona fides at the expense of the truth in its reporting, and a preconceived and deliberate narrative that CBS brought to the allegations made by Tyson and Watson against Fairfax.

### CBS Acted with Actual Malice by Failing to Adequately Investigate the Watson Allegations Using Appropriate Journalistic Standards

210.    Considering the sensational and highly damaging accusations made by Tyson and Watson against Fairfax, basic journalistic standards required CBS to investigate these serious allegations before airing them.

211.    Upon information and belief, nobody at *CBS This Morning* or CBS Broadcasting Inc. investigated or adequately fact-checked Watson's allegations before airing them, even

though they knew that airing these allegations to a nationwide television audience would seriously harm or possibly even destroy Fairfax's career.

212.    Had CBS investigated the allegations, they would have learned each woman's account was false and motivated by political and personal animus against Fairfax.

213.    It is not known whether CBS contacted the AGC after Fairfax's spokesperson gave O'Keefe his name on February 8, 2019. Certainly, in the intervening two months between the February text and the April interviews, there was adequate time and opportunity for O'Keefe to have investigated this crucial lead involving CBS' own legal counsel. It is not known whether CBS contacted the AGC and learned that he had information indicating that the encounter between Watson and Fairfax was consensual, or whether CBS decided not to investigate any lead given to them by Fairfax nearly two months prior to ensure that the story was not contradicted and fit CBS' pre-conceived narrative that Fairfax was guilty.

214.    Had O'Keefe, or anyone at CBS, contacted the AGC, they also would have learned that CBS' own lawyer personally knew Watson and Fairfax and had learned information from the eyewitness that their encounter had been completely consensual.

215.    CBS refused to ask—or did not air—basic questions to establish what supposedly happened during these two encounters, particularly during Watson's encounter with Fairfax. This was an affirmative choice by CBS, because Fairfax's spokesperson had requested prior to the airing of the interviews that CBS ask certain questions meant to "pressure-test" the truth of her allegation.

216.    On March 28, 2019, after learning about the upcoming interviews though a non-CBS source, a spokesperson for Fairfax texted with Gayle King, urging her to ask Watson "what

exactly happen[ed] that day, where, when, **did you see anyone else on your way in or out?**" A screenshot of the text exchange is below:



217.    Despite the specific interview request by Fairfax's spokesperson, King did not ask Watson a basic question: "where did the encounter occur?" More specifically, King did not ask Watson to identify whose fraternity house dorm room it was.

218.    This was a crucial question and line of inquiry that would have tested the veracity of Watson's claims. Fairfax did not live in that building during the 1999-2000 academic year. Thus, the encounter took place in someone else's room, which made it much more likely there was an eyewitness. By not asking this basic question (or not airing the answer given by Watson

if the question was asked), King allowed Watson to tell a sensational and fabricated story of a rape and sexual assault that never occurred to a nationwide audience.

219.    Also, despite the specific pre-interview request by Fairfax's spokesperson, King did not ask Watson another incredibly basic question: "Who was there?" More specifically, King did not ask Watson, "did you see anyone else on your way in or out [of the dorm room]?"

220.    This was another crucial question, especially since there was an eyewitness present before, during, and after the encounter. By ignoring the request to ask Watson this basic question (or not airing the answer if the question was asked), King recklessly permitted Watson to defame Fairfax to millions of viewers in Virginia and nationwide with a demonstrably false, fabricated, and vicious allegation.

221.    The failure to ask these basic questions that any reputable journalist would ask, and that Fairfax's spokesperson specifically requested be asked, was an extreme departure from accepted journalistic standards.

222.    CBS knew that Watson claimed the encounter took place in the Alpha Phi Alpha fraternity house at Duke. Alpha Phi Alpha was the only African American fraternity with a fraternity house at Duke at that time. CBS could have easily discovered the names of the members of the fraternity during that school year, including the ones who lived in that fraternity house, by checking a Duke yearbook or contacting Duke.

223.    Upon information and belief, as part of its effort to avoid learning the truth of what happened during the encounter, CBS did not interview any of the other Alpha Phi Alpha fraternity brothers at Duke during the 1999-2000 school year, did not interview the person in

whose room at the fraternity house the encounter took place and did not interview anyone who was an eyewitness to the encounter.

224.   Upon information and belief, CBS deliberately disregarded information that contradicted Watson's story. It did not press her with standard questions about where the event occurred and who was there, or it selectively edited the interview so as not to air her answers to those questions.

225.   Upon information and belief, CBS had reason to doubt Watson's story based on its pre-interview of her, and for other reasons, and yet aired it anyway. Watson had previously accused the Duke Athlete of rape during the prior school year and claimed during the interview that she had reported that rape "to an official at the university." Watson claimed that she did not report the alleged assault by Fairfax to Duke because this "official" had not acted when she supposedly reported the assault by the Duke Athlete the year before. CBS knew that Duke had denied knowing about the supposed rape by the Duke Athlete, as it aired during the segment that "As for Watson's claim that she had been assaulted by a Duke basketball player, the university also said this in February: that it first learned of the allegation when it appeared in the press that month." Even though CBS knew that Watson's story about reporting the other assault to a Duke "official" was likely not true, and thus having information that called Watson's credibility into serious doubt, CBS aired her story about Fairfax anyway, once again with reckless disregard for the truth.

226.   CBS could have required that Watson waive the restrictions of the Family Educational Rights and Privacy Act ("FERPA"), which would have given CBS access to Watson's Duke educational records that could have proven or disproven Watson's story that she

93

reported the supposed rape by the Duke Athlete to a Duke "official." It is not yet known whether CBS asked Watson for this waiver or instead made a calculated decision not to ask her for a FERPA waiver to purposefully avoid the facts they would learn from receiving the records.

227.    *CBS This Morning* aired Watson's interview with King on April 2.

228.    In her interview, Watson again recounted the same false allegation of rape and sexual assault against Fairfax. She also described a later uncorroborated conversation in which she alleges that Fairfax revealed his purported motive by citing her alleged rape by the Duke Athlete – a conversation that never happened and was separately defamatory.

> [H]e did things that you shouldn't do to someone without their permission. And I tried several times to get up and leave and was pushed back down. . .. He forcibly sexually assaulted and raped me. . .. I was not on the bed, initially. There was a couch. And he pulled me over and I tried several times to get up and was pushed back down, held down. . .. It was very clear.

229.    Watson did not mention during the interview that the sexual encounter occurred in the eyewitness' room, that the eyewitness was there throughout, and that she remained in the room with the eyewitness after Fairfax left.

230.    Indeed, since the July 9 revelation that there was an eyewitness to the entirely consensual encounter, Watson's lawyer Nancy Erika Smith, through a spokesperson, has stated that she is unwilling to address whether there was a third person present during Watson's alleged rape by Fairfax.

231.    Furthermore, from February 8 to July 9, Smith, through her personal Twitter account, in numerous media accounts, and elsewhere, repeatedly and publicly called Fairfax a "rapist" and said that he had "raped" Watson. Upon information and belief, after the exculpatory evidence was made public on July 9, Smith curtailed her public comments calling Fairfax a

94

"rapist" and stating that Fairfax had "raped" Watson. It is unknown whether CBS contacted Smith or Watson on or after July 9 to ask them whether the exculpatory information revealed publicly that day concerning Watson's allegation was true or whether Smith or Watson provided CBS with an answer.

232.    In the three months since this revelation on July 9, Watson's lawyer has not denied that an exculpatory eyewitness was present during the encounter. If there was in fact no one else present, the denial from Smith and Watson would have been immediate. In this same three months, upon information and belief, CBS has not contacted Watson or Smith or corrected its reporting.

233.    For CBS to ignore these crucial factual developments, which indicate that Watson's allegations are false and that her own legal counsel now appears unwilling to continue to publicly vouch for them, while continuing to publish her interviews, and expressly consenting to allow others to republish them, is clear evidence that CBS acted with reckless disregard for the truth of Watson's story when it was published and has continued to do so as of the date of this filing.

### CBS Showed Actual Malice when its Reporters Made Numerous Contemporaneous Comments Vouching for the Truthfulness of Watson's Story

234.    In the introductory segment preceding Watson's interview, King called the details that were about to be shared "disturbing," thus vouching for the truthfulness of them.

235.    Immediately following one of the segments airing Watson's interview, King, O'Donnell, and Dickerson made erroneous factual statements and improperly vouched for the credibility of Watson's story—with no independent investigation or objective basis in fact—and

95

made it clear to the audience that the *CBS reporters were intending to corroborate the truth* of Watson's allegation against Fairfax:

| | |
|---|---|
| Co-Host Norah O'Donnell: | **There's an incredible amount of pain there.** (referring to Watson's tearful interview) |
| King: | **Yes. All these years later.** |
| O'Donnell: | All these years later, **that pain has stuck with them about how they felt in that moment, and how it has affected them for decades.** |
| Co-Host John Dickerson: | Think about the learning we've done. **There was a period, half a year ago**, when people said, "You know these people are coming forward after so many years. |
| King: | Why? |
| Dickerson: | Why are they coming forward? **How can it really be so real?** And, **we have now seen example after example of how it is as real (snaps fingers) as if it happened yesterday**. |
| King: | **Exactly right, John**. |

236.    Upon information and belief, O'Donnell and Dickerson did not investigate the allegations by Watson under accepted journalistic standards, or at all, before vouching for the truthfulness of them. The reporters' statements and assertions demonstrate the severe bias and slant by CBS toward accusers in covering the allegations against Fairfax.

**CBS Acted with Actual Malice by Failing to Adequately Investigate the Tyson Allegation Using Appropriate Journalistic Standards and by Failing to Report that Tyson's Allegation Had Been Carefully Investigated by The Post and Was Found to Be Uncorroborated**

237.    CBS This Morning aired Tyson's interview with King on April 1.

238.    In her interview, Tyson recounted the same false allegations of sexual assault similar to those that she first made in February. Specifically, she said:

> I couldn't feel my neck. I couldn't hold my head up. . .. He's using his hand on the back of my neck. And I still didn't know what was going wrong. I thought there was something wrong with my neck… And he's pushing down and pushing down. And I couldn't hold my neck up. And I didn't know what was going on. I honestly didn't know what was going on. And then the next thing I know, like, my head is, like, literally in his crotch… And I'm choking and gagging. And, you know, I couldn't say anything 'cause I'm choking and gagging. And so, you know, it continues for-- and he's holding my head. So I can't lift-- like, I'm trying to lift my head, but I can't.

239.    Neither the interview nor King's additional reporting on the story suggests that anyone at CBS made any attempt to confirm Tyson's account.

240.    Upon information and belief, this was a departure from journalistic standards.

241.    Upon information and belief, CBS did not seek to interview relevant witnesses about the encounter between Tyson and Fairfax, including interviews that would have revealed facts that were inconsistent with Tyson's story.

242.    Upon information and belief, CBS was aware prior to airing Tyson's interview in April 2019 that *The Washington Post* had investigated her claim for several months beginning in the fall of 2017 and made the decision in March 2018 not to publish her story because, according to *The Washington Post*, it "could not find anyone who could corroborate" her version of the allegation and did not have "the ability to corroborate [Tyson's] account – in part because she had not told anyone what happened." Even when *The Washington Post* ultimately did publish the

story about Tyson's allegation, it had to acknowledge that despite an extensive investigation it still had no corroboration for the story and no established pattern of misconduct by Fairfax.

243.     Given that CBS knew that *The Washington Post*, a major national media organization with significant reporting resources, had carefully investigated Tyson's allegation for several months and still could not corroborate it, the network acted with reckless disregard for the truth of her allegation by publishing and televising her uncorroborated allegation to millions of viewers in Virginia and nationwide without any additional independent investigation, with no new evidence to support the veracity of her story, and without mentioning to CBS' viewing audience that *The Washington Post* had conducted a months-long investigation into Tyson's story and found no corroboration to support it.

***CBS Showed Actual Malice when its Reporters Made Numerous Contemporaneous Comments Vouching for the Truthfulness of Tyson's Story***

244.     During the Tyson interview segment, King and other members of the CBS reporting team repeatedly made inaccurate factual assertions and vouched for the credibility of Tyson's allegations with no independent investigation or objective basis in fact:

| King: | It was fascinating talking to her [Tyson] because I felt at some point it's almost like she was going back to the moment that she believed. |
|---|---|
| Co-Host Norah O'Donnell: | Yeah. |
| Bianna Golodryga: | Yeah, you could see that. |
| King: | You could really see that in her eyes. |
| King: | And, people would say, "Yeah, but she went to the hotel room. Yeah, she agreed to the kissing.   Isn't that on her?" But, I could see |

|  | as a young person, you have a mutual friend and **you think this guy is safe**, and the kissing doesn't necessarily have to lead to what she said happened after that. |
|---|---|
| Golodryga: | Something clearly changed when she was walking **through what transpired**. And, you could see where she got very emotional and **went to that dark place**. |
| Co-Host Norah O'Donnell: | **It feels like she was forced.** |
| King: | **Yeah.** |

245.     Upon information and belief, O'Donnell, King and Golodryga did not investigate the allegations by Tyson under accepted journalistic standards, or at all, before asserting facts about what occurred and vouching for the truthfulness of Tyson's false allegations.

246.     Later that day, Fairfax's spokesperson texted with King and Sokoloff, asking them to "take note of the differences between Tyson's previously released statement and the interview broadcast this morning."

247.     In fact, CBS ignored important inconsistencies between Tyson's taped interview and her February 6, 2019, statement.

248.     For example, in her statement, Tyson said that after they began kissing consensually Fairfax "*pulled* [her] towards the bed." By contrast, in her interview with King, Tyson said that Fairfax "kind of *gently takes my hands*, um, and *guides me towards the bed*. We're still kissing, and it's completely consensual. *He guides me to the bed* and, you know, he sits down on the bed. And, what happens from there, is we start kissing lying down." Tyson's written statement falsely implies that Fairfax used physical force ("pulled") to move Tyson without her consent to the bed in order to dramatize the encounter and create the false impression

that Fairfax was making Tyson do something she did not want to do. King did not ask Tyson about this discrepancy in her accounts.

249.    Also, in describing how she came to perform oral sex on Fairfax allegedly against her will, Tyson wrote in her statement that "I tried to move my head away, but could not *because* his hand was holding down my neck and he was much stronger than me." However in her interview, Tyson states for the first time publicly that she allegedly did not pull away because "[her] neck didn't work" and she "couldn't feel [her] neck." Tyson's statement again dramatizes the encounter by stating that the only reason she did not move her head away was because of force allegedly applied by Fairfax and because of his strength. By contrast in her interview, Tyson later claims that she could not pull away because, at that precise moment, she began to experience some unspecified physical problem with her neck that she could not explain. King does not ask about that discrepancy. She also did not ask whether Tyson had ever experienced her neck not working on any other occasion or if she had ever sought treatment for any physical issues involving her neck.

250.    At an even more fundamental level, there were clear indications that Tyson's motivations for telling her story were evolving and, accordingly, subject to question. In that regard, Tyson initially wrote that her February 6 statement detailing her version of the alleged assault "is the only statement I and my legal team will be making." The fact that Tyson was being interviewed by King on national television less than two months later, and had made numerous statements in the media through her legal team after February 6, shows that this assertion was plainly false and called into question Tyson's veracity and motives. King did not ask Tyson about that discrepancy either.

100

251.    Additionally, in her February 6 statement, Tyson claimed that she wanted to return to her private life and have nothing further to do with the politics created by this situation – claims that are directly contradicted by her, and her attorneys', actions over the past nearly eight months. In February she wrote, "I very much wish to resume my life as an academic and professor. I do not want to get further embroiled in this highly charged political environment." That statement is completely undermined not only by her April nationally-broadcast interview with King, but also by the fact that in the nearly eight months since she first made her allegation public, Tyson and her attorneys have incessantly called for legislative hearings in the Virginia General Assembly to find yet another political, and non-judicial, forum to once again air her uncorroborated allegation. CBS has not reported on this glaring contradiction regarding Tyson's motives and credibility either.

### *CBS Acted with Actual Malice by Airing These Defamatory Interviews at a Time that Would Maximize CBS' Ratings and Profit by Damaging Fairfax's Reputation, Rather than Waiting Until It Had Investigated the Allegations*

252.    The timing of the airings of these interviews on April 1-2 was calculated to maximize ratings for CBS in light of the ongoing scandal involving Governor Northam and speculation that Fairfax might still become the next Governor of Virginia if Northam resigned. The timing also ensured that the damage to Fairfax would be considerable. Fairfax was set to preside over a reconvened session of the Virginia Senate on April 3 and CBS' hyping of the allegations against Fairfax at that time both assured greater media coverage of the reconvened session and supported the publicly-announced tactics of the accusers to maximize political pressure on the General Assembly to conduct a highly political public hearing and to maximize pressure on the Lieutenant Governor to resign.

253.    Upon information and belief, *CBS This Morning* totaled over 3 million viewers during the week of April 1, 2019. Over one million viewers watched either or both of the King interviews of Tyson and Watson.

254.    CBS actively promoted the interviews in advance of the air date. Upon information and belief, this permitted CBS to profit on its advertising revenue in Virginia and across the nation during the airing of these interviews.

255.    CBS aired these interviews, knowing that they had not been fully vetted under accepted journalistic standards and instead aired them to maximize its own profit by damaging Fairfax's reputation.

256.    Upon information and belief, CBS had serious doubts as to the truth of these statements and a high degree of awareness that they were probably false, and therefore was required to investigate their veracity before publishing them. Its doubts are shown in part by King's failure to ask Watson and Tyson basic questions about their encounters with Fairfax and the CBS team's failure to conduct any independent investigation, even within its own organization where an AGC was in a position to provide notice of compelling evidence that Watson's allegations were false. CBS' failure to do so amounts to actual malice. It purposefully avoided, and continues to purposefully avoid, the truth by failing to follow standard journalistic practices.

### CBS Acted with Actual Malice as Shown by Its Failure to Correct the Stories After Evidence Contradicting the Stories Emerged

257.    On June 12, 2019, Fairfax, through his lawyer, sent a letter to an Assistant District Attorney in Suffolk County, Massachusetts, urging the office to investigate Tyson's allegations.

On that day, Fairfax's counsel also sent a letter to the District Attorney in Durham County, North Carolina, urging her to investigate Watson's allegations.

258.     On July 9, Fairfax, through his counsel, sent another letter to the Durham County District Attorney urging her to investigate Watson's allegation and indicating that an eyewitness to the encounter could testify to its entirely consensual nature.

259.     Fairfax's letters received widespread news coverage, and, upon information and belief, multiple local stations affiliated with CBS updated their stories concerning both Watson's and Tyson's allegations, including with the crucial new development of the exculpatory eyewitness who could debunk Watson's allegation.

260.     CBS, however, did not update its reporting or the videos of interviews on its website, social media accounts or in its television coverage of Fairfax to indicate the presence of an eyewitness, or that Fairfax had called for criminal investigations of each allegation, both of which are strong evidence that the initial stories aired by CBS were false.

261.     On July 10, one day after the revelation of the exculpatory eyewitness was made public, Fairfax's spokesperson texted King, Sokoloff and Verdugo with follow-up questions for Watson. CBS again ignored Fairfax's requests to correct its reporting to reflect that an eyewitness was present during his encounter with Watson, *even though Smith and Watson, stunningly and tellingly, did not deny, and have not denied, this exculpatory information*.

[REMINDER: REDACT CM'S NAME IN TEXT BELOW]



262.    CBS ignored these requests despite having the ability to verify Fairfax's account by simply speaking to its own AGC or by reaching out to Tyson's and Watson's representatives to ask additional questions.

263.    Upon information and belief, CBS never asked Watson any follow-up questions after hearing of these new critically material facts. CBS' failure to report on these new facts is further evidence of its ongoing actual malice and its motive to ensure that the Tyson and Watson stories fit its preconceived narrative and assisted in CBS' efforts to repair its own damaged reputation in the #MeToo environment. Alternatively, if CBS did ask Watson these follow-up questions, it did not air her answers or report on her refusal to answer them.

264.    Prior to the July 9, 2019, public revelation that an eyewitness had stated that Watson's allegation against Fairfax was false, CBS reporting staff, including King, Sokoloff, Verdugo, and O'Keefe were in regular touch with Fairfax's spokesperson and were highly responsive to her outreach. After that revelation, the reporting staff was almost completely

unresponsive to outreach by the spokesperson, with one exception being an August 16, 2019, reply email from Sokoloff – on which she copied King, O'Keefe, and Verdugo – that broke more than a month of conspicuous and unusual silence from CBS' reporting team. In an August 17 reply-all response to that email, Fairfax's spokesperson again provided information about the exculpatory eyewitness, including how to contact him, reiterated that the CBS AGC had critical information that would demonstrate Watson's allegation to be false, and requested that CBS update its reporting to reflect the new, contradictory information. Tellingly, CBS never responded to that email or to that request.

265.    CBS has continued to refuse to update its reporting to reflect the existence of the exculpatory eyewitness in the Watson story revealed on July 9, 2019 and has consciously avoided verifying this crucial information with the AGC, Watson, or Smith.

266.    Other news outlets, including *The Washington Post*, *Associated Press* and *The New York Times*, have updated their stories to reflect the new, contradictory information but CBS has refused to do so. CBS has refused to do so even though its own affiliates located in Virginia have updated their own stories to reflect the new, contradictory information. This further clearly demonstrates CBS' goal to ensure that the Watson and Tyson interviews are not fact-checked or debunked and fit CBS' preconceived narrative.

*Extreme Harm to Fairfax, His Family, and His Career*

267.    As a direct result of Tyson's and Watson's false and defamatory allegations of sexual assault and rape against him, and NYPR's and Perry's airing of same, Fairfax has suffered severe, ongoing professional, personal, economic and emotional harm.

268.    As a direct result of Tyson's and Watson's false and defamatory allegations of sexual assault and rape against Fairfax, and NYPR's and Perry's airing of same, many other media outlets have reported on portions of their interviews, including the false statements published therein.

269.    At the time NYPR aired the defamatory Broadcast, Fairfax was quietly serving out his final months as Lieutenant Governor, fulfilling his constitutional responsibility to preside over the Senate of Virginia and beginning his transition to seek legal and other employment opportunities in the private sector. The defamatory Broadcast published by NYPR to a nationwide audience that includes 300 public radio stations (4 of which broadcast in Virginia) and nearly 1 million average weekly listeners has severely and negatively impacted Fairfax's stellar legal career and previously high earnings potential.

270.    Fairfax's wife and his children, ages 12 and 11, have suffered emotional trauma, public ridicule, threats to their safety, and invasions of privacy.

271.    Most importantly, Fairfax has been falsely branded a "rapist," "predator" and "sexual abuser." This circumstance all but forecloses his ability to earn a living and provide for his family. His once promising career and political prospects have been severely harmed by the reckless airing of these false allegations.

## COUNT ONE – DEFAMATION

272.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

273.    Fairfax is a public figure.

274.    NYPR published and re-published Tyson's and Watson's interviews and statements on its network to a worldwide audience – and to 300 public radio stations nationwide (with 4 located in Virginia) -- on or about August 6, 2021. NYPR and Perry repeatedly and improperly vouched for the truthfulness of facts and claims asserted in those interviews -- without any independent investigation or objective basis in fact – demonstrating severe media bias and slanted reporting in favor of Tyson and Watson and against Fairfax. The interviews were published and republished, with knowledge of their falsity or with reckless disregard for the truth, to massive numbers of NYPR listeners in Virginia, across the country and around the world.

275.    NYPR was the only major radio network to publish interviews with Tyson and Watson.

276.    NYPR and Perry also published and republished the Broadcast on its website, on its various social media platforms, including Twitter, Facebook and YouTube, Virginia residents are among the many members of the audience of the Broadcast and social media postings.

277.    In her own social media postings (especially on her twitter account @MHarrisPerry) and elsewhere, Perry also repeatedly and improperly vouched for the truthfulness of facts and claims asserted by Tyson and Watson in those interviews and elsewhere

-- without any independent investigation or objective basis in fact – demonstrating severe media and personal bias and slanted reporting in favor of Tyson and Watson and against Fairfax.

278.    NYPR and Perry published the interviews with Tyson and Watson despite knowing or recklessly disregarding that they contained false statements and despite knowing key facts and key lines of questioning that would have debunked each story. NYPR and Perry also acted with actual malice by airing stories that had not been properly vetted under accepted journalistic standards, by seeking to fit the allegations of Tyson and Watson into its preconceived narrative that the allegations were true, and by airing politically explosive and false stories at a time when rehashing the allegations was gratuitous, unnecessary and primarily meant to harm the reputation and career of Fairfax as he prepared to leave public office and return to private legal practice and private life.

279.    Even having knowledge of an exculpatory eyewitness to the 2000 encounter at Duke University between Watson and Fairfax, NYPR and Perry still published and republished Watson's false statements and accusations about that consensual encounter (without even a mention to the audience of that exculpatory information), demonstrating NYPR's and Perry's continued actual malice and purposeful avoidance of the truth.

280.    NYPR, through Perry and The Takeaway editorial team and staff, acted with actual malice by knowingly or intentionally disregarding the truth in publishing false and defamatory accusations by Watson and Tyson against Fairfax.

281.    NYPR's and Perry's airing of the accusations have falsely portrayed Fairfax as a rapist, sexual abuser, and a predator.

282.    NYPR's and Perry's airing of the accusations are defamatory *per se* as to Fairfax. They impute that Fairfax committed sexual assault and rape – crimes involving moral turpitude. They also were intended to injure Fairfax in his profession as a public servant and lawyer.

283.    As a direct and proximate result of NYPR's and Perry's actions, Fairfax has lost significant income, his reputation has been damaged, and his professional prospects have been significantly diminished.

284.    NYPR's and Perry's actions were malicious, willful, and wanton, and evidence a conscious disregard for the rights of Fairfax. Accordingly, punitive damages are appropriate.

## COUNT TWO – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

285.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

286.    NYPR aired Perry's interviews with Tyson and Watson while intentionally or recklessly failing to investigate and consciously avoiding lines of inquiry and learning facts that would have disproved or called into question each woman's false statements.

287.    NYPR and Perry also have refused to update or correct their reporting, despite having knowledge that there was an exonerating eyewitness to the encounter with Watson and other information that seriously calls into question the truth of the stories told by Watson and Tyson – and published and re-published by NYPR and Perry – about Fairfax.

288.    NYPR's and Perry's conduct resulted in Fairfax continuing to be viciously and wrongfully labeled a "rapist," "accused rapist," "sexual abuser" and "predator" – effectively a

violent criminal. Such allegations are extreme, outrageous and intolerable to a person, such as Fairfax, who did not commit any crimes.

289.    As a result of NYPR and Perry making and airing false allegations, Fairfax has suffered severe emotional distress. Fairfax's distress comes from the invasion of his and his family's privacy, threats to his safety and that of his family, extreme embarrassment at being called a criminal, a rapist, and a sexual predator, watching his wife and young children face questions and verbal abuse, and the extreme loss of financial resources and his highly-positive professional reputation—a reputation that he has spent his entire lifetime building.

290.    Furthermore, NYPR and Perry have enabled Watson and Tyson to continue – after three and a half years and counting – to defame and slander Fairfax to a new and broader audience while continuing to avoid any investigation or court proceeding which would formally establish the falsity of their fabricated accusations and finally give Fairfax the ability to clear his previously unblemished name. Allowing these false accusations to hang over Fairfax's head and affect his life (and his family's life) indefinitely – with no due process or venue for adjudication – is also unconscionable, extreme, and intolerable – especially for an innocent person – in civil society.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Justin Fairfax demands judgment against the Defendants, jointly and severally, as follows:

(a)     awarding compensatory damages of not less than thirty-five million dollars ($35,000,000.00);

(b)     awarding punitive damages;

(c)     awarding all expenses and costs, including attorneys' fees;

(d)     an injunction prohibiting the Defendants from disseminating, distributing, or publishing any footage or statements that are judicially determined to be defamatory; and

(e)     such other and further relief as the Court deems appropriate.

A JURY TRIAL IS DEMANDED

Dated: August 6, 2022

Respectfully Submitted,

By: /s/ Kenneth D. Bynum
Kenneth D. Bynum (VSB #23177)
Bynum & Jenkins
1010 Cameron Street
Suite 123
Alexandria, VA 22314
(703) 537-5522
kbynum@bynumandjenkinslaw.com

Thomas B. Martin (*pro hac vice* application to be filed)
Martin Law PLLC
5028 Wisconsin Avenue, NW
Suite 100
Washington, DC 20016
202-390-7802
tmartin@martinlawdc.com
*Attorneys for Plaintiff*